1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   WILLOW E. RADCLIFFE (200087)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   willowr@rgrdlaw.com

6   Lead Counsel for Plaintiff

7   [Additional counsel appear on signature page.]

8                UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10  In re CELERA CORP. SEC. LITIG.        )   No. 10-cv-02604-JW(HRL)
                                          )
11  ──────────────────────────────────── )   CLASS ACTION
                                          )
    This Document Relates To:             )
12                                        )   CONSOLIDATED AMENDED
        ALL ACTIONS.                      )   COMPLAINT FOR VIOLATION OF THE
13                                        )   FEDERAL SECURITIES LAWS
    ──────────────────────────────────── )
14  WASHTENAW COUNTY EMPLOYEES'           )
    RETIREMENT SYSTEM, Individually and on)
15  Behalf of All Others Similarly Situated,)
                                          )
16                        Plaintiff,      )
                                          )
17              vs.                       )
                                          )
18  CELERA CORPORATION, KATHY             )
    ORDOÑEZ, JOEL R. JUNG, UGO DeBLASI    )
19  and CHRISTOPHER HALL,                 )
                                          )
20                        Defendants.     )   DEMAND FOR JURY TRIAL
    ──────────────────────────────────── )
21

22

23

24

25

26

27

28

581621_1

1

**TABLE OF CONTENTS**

2

**Page**

3    STATEMENT OF THE CASE.................................................................1

4    JURISDICTION AND VENUE ............................................................7

5    PARTIES .......................................................................................8

6    CONFIDENTIAL WITNESSES ........................................................10

7    OVERVIEW OF CELERA'S FALSE FINANCIAL STATEMENTS .........17

8          GAAP Requires Adequate A/R Reserves .........................................18

9          Celera Knew Accounts Receivable Was Likely Uncollectible and Violated GAAP ........19

10         Reimbursement Was Denied or Sent to Patients Instead of Celera and Most
           Customers Were Non-Contract Insurers and Individuals .............................19
11

12         Celera's DSO During the Relevant Period Was Excessively High and Well Above
           the Industry Norm ......................................................................20

13         Celera's Allowance as a Percentage of Net Receivables Was Steadily Increasing..........22

14         Defendants' Knowledge.................................................................24

15         Other GAAP Violations.................................................................24

16   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE
     CLASS PERIOD .............................................................................26
17

18         Defendants Falsely Reported Inflated Earnings and Understated Expenses for
           Fiscal 3Q 2008 and Misled Investors About Celera's Business .........................26

19         Reasons Why Defendants' 3Q 2008 Statements Were Materially False and
           Misleading................................................................................28
20

21         Celera's June 2008 Registration Statement Falsely Created the Impression that
           Celera Properly Reserved for Doubtful Accounts and Incorporated Celera's
           Falsely Reported Fiscal 3Q 2008 Earnings and Expenses................................30
22

23         Reasons Why Celera's June 2008 Registration Statement was Materially False
           and Misleading............................................................................32

24         Defendants Falsely Reported Inflated Earnings and Understated Expenses for
           Fiscal 4Q 2008 and FY 2008, and Mislead Investors About Celera's Business ..............34
25

26         Reasons Why Defendants' Fiscal 4Q 2008 and FY 2008 Statements Were
           Materially False and Misleading.........................................................37

27         Defendants Falsely Reported Inflated Calendar 3Q 2008 Earnings, Understated
           Expenses and Continued to Mislead Investors About Celera's Business.....................39
28

1

2                                                                                          **Page**

3          Reasons Why Defendants' Calendar 3Q 2008 Statements Were Materially False
           and Misleading.................................................................................................42
4
           Defendants Falsely Reported Inflated 4Q 2008 Calendar and 2008 Year End
5          Transition Earnings, Misled Investors About Celera's Business and Falsely
           Provided 2009 Guidance ..................................................................................44
6
           Reasons Why Defendants' 4Q 2008 Calendar and FY 2008 Transition Period
7          Statements Were Materially False and Misleading ..........................................50

8          Defendants Falsely Reported Inflated 1Q 2009 Earnings, Understated Expenses
           and Reiterated False 2009 Guidance.................................................................53
9
           Reasons Why Defendants' 1Q 2009 Statements Were Materially False and
10         Misleading.........................................................................................................58

11         Defendants Signed False Statements Regarding Celera's Internal Controls and
           Procedures.........................................................................................................60
12
           Reasons Why Defendants' Internal Controls and Procedure Statements Were
13         Materially False and Misleading.......................................................................62

14         The End of the Class Period..............................................................................64

15  ADDITIONAL ALLEGATIONS OF SCIENTER-EXECUTIVE COMPENSATION................69

16  ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS.......................70

17  CLASS ACTION ALLEGATIONS ................................................................................73

18  APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET
    DOCTRINE ..............................................................................................................74
19
    NO SAFE HARBOR .................................................................................................75
20
    COUNT I ................................................................................................................76
21
           For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants ...........76
22
    COUNT II ...............................................................................................................76
23
           For Violation of §20(a) of the 1934 Act Against All Defendants ....................................76

24

25

26

27

28

**STATEMENT OF THE CASE**

1.       This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Celera Corporation ("Celera" or the "Company")[1] between April 24, 2008 and July 22, 2009, inclusive (the "Class Period").  This action asserts fraud claims under the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder against Celera, its Chief Executive Officer Kathy Ordoñez, its former Chief Financial Officers Joel R. Jung and Ugo DeBlasi, and its form Chief Business Officer of Berkeley HeartLab ("BHL") Christopher Hall.

2.       Celera is a personalized disease management company.  Defendants' scheme to defraud investors principally relates to Celera's lab services segment, which offers clinical laboratory tests and disease management.  This segment was created when Celera purchased BHL in October 2007 for approximately $195 million, essentially doubling the scale of Celera.

3.       As detailed herein, during the Class Period, defendants issued false and misleading statements regarding Celera's business and financial results, repeatedly assuring investors that: (i) Celera's lab services segment (BHL) was being reimbursed by Medicare and large insurance companies; (ii) individual patients were responsible for very little out of pocket expenses which, coupled with BHL's focus on secondary patients (patients who already were under care), insulated Celera's lab services segment from economic concerns; (iii) the Company was adequately reserving for its bad debts; and (iv) that Celera maintained sufficient internal controls and procedures.  In fact, defendants relied on individual patients for reimbursement for significant amounts and failed to properly account for BHL's bad debt, resulting in overstated earnings, understated expenses, overstated assets and artificial inflation of the Company's stock.  Further, defendants' 2009 revenue and expense guidance had no reasonable basis because: (i) Celera's BHL division was losing customers left and right as a result of the changes in Celera's billing practices; and (ii) defendants

---

[1]       This includes purchasers of Celera Group, a tracking stock of Applera Corporation ("Applera"), which traded on the New York Stock Exchange ("NYSE") under the ticker CRA and Celera once it split-off on July 1, 2008 to become an independent publicly traded company on the NASDAQ under the ticker CRA.

1   had failed to properly reserve for BHL's bad debt, which required increasing Celera's reported

2   expenses.  As a result of defendants' false statements, Celera stock traded at artificially inflated

3   prices throughout the Class Period, trading as high as $16.23 per share in September 2008.

4        4.      As part of the acquisition due diligence process, Celera was provided complete access

5   to BHL's billing and receivables.  Once the acquisition was completed, Celera managed BHL's

6   business, including its financial reporting; defendant Kathy Ordoñez ("Ordoñez") told investors even

7   before the Class Period that finance was a "central function" of Celera that supported BHL.

8   Defendants also assured investors in U.S. Securities and Exchange Commission ("SEC") filings that

9   they had "an established process to estimate and review the collectibility of its receivables based on

10  the period of time the receivables [had] been outstanding" and that the "process include[d] the close

11  monitoring of billings and the collection experience" reducing the "risks of material revisions to

12  allowance estimates."

13       5.      By early 2008, however, the risk of collecting on BHL's aged receivables was already

14  mounting.  While Celera's business model for BHL depended on reimbursement for lab services

15  from Medicare and large insurance carriers, unbeknownst to investors, one of the largest insurance

16  carriers, Blue Cross/Blue Shield, had begun to remit payment for the lab tests performed by BHL

17  directly to patients rather than to Celera, thereby increasing Celera's bad debt.  In addition, common

18  metrics for assessing the quality of the receivables for Celera's lab services segment demonstrated

19  additional risk to BHL's receivables that necessitated an increase in Celera's allowance for doubtful

20  accounts – the days sales outstanding ("DSO") and allowance as a percentage of net receivables

21  were mostly double the industry norm during the Class Period.

22       6.      Defendants, having recently completed the BHL acquisition and in the midst of a

23  split-off from Applera, could not reveal to the investing public the dismal truth that Celera's

24  accounts receivable ("A/R") were critically impaired.  Thus, beginning with Celera's financial

25  results ending on March 31, 2008 (fiscal 3Q 2008), and ending with Celera's financial results for the

26

27

28

1   period ending March 31, 2009 (fiscal 1Q 2009),[2] defendants failed to disclose impairment of

2   Celera's A/R, violated Generally Accepted Accounting Principles ("GAAP"), SEC rules and other

3   accounting principles, and concealed the adverse financial impact that they knew would result from

4   proper accounting for Celera's A/R.

5          7.     Defendants' fraudulent scheme to conceal Celera's bad debt hinged upon Celera's lab

6   services division being able to contract with insurance companies for definitive amounts for lab tests,

7   thereby creating a steady and stable source of A/R and reimbursements from which they would

8   slowly write-off Celera's bad debt and/or increase doubtful account allowances without alerting

9   investors. In other words, Celera could dilute its bad debt with predictable and readily collectible

10  receivables from the contracted insurance companies which would not require an increase in the

11  allowance for doubtful accounts. Defendants, however, were largely unsuccessful in contracting

12  with insurance companies during the Class Period and, as a result, could not sustain their scheme to

13  conceal Celera's bad debt forcing a write-down of more than $20 million in bad debt and increasing

14  the Company's allowance for doubtful accounts to $39.2 million, an 86% increase over the

15  allowance reported three months earlier and an increase of more than 360% for the allowance

16  reported one year earlier.

17         8.     Throughout the Class Period, defendants announced top-line revenue growth and

18  related earnings while playing hide-the-ball with Celera's bad debt. Celera's (and BHL's) revenues

19  and earnings reported in the earnings releases were as follows:

20

21

22

23

24

---

25  [2]     Prior to July 2008, Celera had a June 30 fiscal year-end. In July 2008, Celera's Board of

26  Directors approved a change to a 52- or 53-week fiscal year ending on the last Saturday in December. The Company filed a Form 10-KT in March 2009 for the six-month transition period

27  ended December 27, 2008. Thus, throughout the complaint there are references to fiscal and calendar reporting periods.

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                   - 3 -

| | Quarter Ended 3/31/08 | Quarter Ended 6/30/08 | Quarter Ended 9/27/08 | Quarter Ended 12/27/08 | Quarter Ended 3/28/09 | Quarter Ended 6/27/09 |
|---|---|---|---|---|---|---|
| Celera BHL EPS | $39.5M | $43.4M | $45.8M | $47.3M | $45.7M | $41.4M |
| | $22.6M | $26.1M | $30.1M | $29.2M | $28.5M | $25.2M |
| | ($0.09) | ($1.21)[3] | ($0.09) | ($0.08) | ($0.02) | ($0.39) |

9.     By the start of the Class Period, defendants were well aware of mounting outstanding receivables that were materially impacting Celera's bottom-line.  While Celera recorded revenue on BHL's lab tests once the results were processed and sent to physicians, the defendants failed, as GAAP requires, to sufficiently accrue for BHL's doubtful accounts based on information known to them at the time.  Had defendants sufficiently accrued for BHL's doubtful accounts, Celera would have had to report an even greater loss to net income and earnings per share (its bottom-line) as a result of increasing its allowance for doubtful accounts.[4]

10.     For example, defendants knew but concealed from investors that in early 2008, Blue Cross/Blue Shield (who they would later state represented approximately 20% of their sample volume) was sending payments directly to patients rather than remitting payment to BHL directly. As a consequence, BHL was required to collect monies from individual patients.  Yet, according to percipient witnesses, Celera did not send collection letters to patients until the receivables had been outstanding for months and virtually uncollectible.   This was a main contributor to BHL's uncollected debt problem.  Indeed, on October 28, 2009, defendant Ordoñez belatedly admitted that Blue Cross/Blue Shield "***resumed***" sending checks as payments to its members; "shift[ing] the onus

---

[3]     During 4Q 2008, Celera took a $91.2 million charge to establish a reserve against Celera's deferred tax assets.  Without the charge and other minor adjustments, Celera indicated it would have recorded a non-GAAP EPS of ($0.01).

[4]     In the earnings releases, conference calls and SEC filings throughout the Class Period, defendants often improperly referred to bad debt expense as the allowance for doubtful accounts. The allowance for doubtful accounts is the aggregate reserve on the balance sheet determined by management to cover losses for probable uncollectible accounts as of the balance sheet date.  Bad debt expense is the corresponding income statement account which reflects the adjustments to income necessary to get the allowance for doubtful accounts to the level management deems sufficient to provide for probable bad debts.  Bad debt expense is a component of selling, general and administrative ("SG&A") expenses.  Defendants' misuse of the terms is misleading as it appears that the allowance for doubtful accounts (*i.e.*, management's estimate of uncollectible receivables) was much lower than even the inadequate amount reported in the Forms 10-Q.

to [Celera] to pursue and collect these outstanding monies from the patients themselves."  Further, she admitted that "this impacts our collections activities and *exposes us to additional bad-debt risk*."  This very practice, however, was occurring in early 2008 and defendants deliberately failed to account for the "*additional bad-debt risk*" rendering Celera's financial statements materially false and misleading throughout the Class Period.

11.  Beginning with the first day of the Class Period, April 24, 2008, defendants also assured investors that BHL's revenue source was solid by claiming that 50% of the payors were Medicare and that the remainder were "[m]ostly out-of-network private reimbursement from the large insurance companies," concealing their knowledge that Celera would have to seek millions in reimbursement from individual patients.  Further, during the Class Period, defendants repeatedly denied that a weak economy and consumer spending would materially impact Celera's business, claiming that BHL's focus on secondary prevention patients coupled with the "very little" or "nothing" out of pocket expense for patients prevented such an impact.

12.  Defendants' scheme began to unravel on February 17, 2009 when Celera, having failed to contract with insurance carriers as planned, was forced to report after the market closed that its SG&A expenses for 4Q 2008 increased 34% over the prior year period, from $20.1 million in the prior year quarter to $27 million: "the single major driver was an increased allowance for bad debt at BHL."  Celera further revealed that the Company's DSO increased as a result of "an increased aging of the BHL non-contracted payer and patient receivables."

13.  Defendants also indicated that for 4Q 2008, Celera's allowance for bad debt had increased $3.7 million but falsely reassured investors that Celera now had "a concerted program to improve collections at BHL."  When asked how much of the SG&A guidance was "implied for the bad debt allowance" by an analyst, however, defendants refused to "get into [that] level of granularity."  While defendants increased Celera's allowance for doubtful accounts, defendants continued to conceal the extent of Celera's devastating bad debt problem.  This included the approximately $20 million owed by individual patients that was at least 230 days outstanding by this time.

14.     Defendants also announced revenue guidance of $192 million to $202 million for FY 2009 and SG&A guidance of $102 million to $112 million, with the expectation that test samples at BHL were expected to increase 20% over 2008 levels.  This compared to reported revenues for calendar 2008 of approximately $175 million and defendants' claim that on a non-GAAP basis, Celera had achieved its first profitable year since separating from Applera.

15.     The market digested the partial revelations and the Company's guidance/news; Celera's stock dropped 26% in a single day, from a close of $9.34 a share on February 17, 2009 to $6.87 a share on February 18, 2009.  Celera's stock remained artificially inflated, however, as a result of the continued concealment of the extent of Celera's bad debt problem and related financial condition as well as defendants' affirmatively false 2009 guidance.

16.     Indeed, in contrast to defendants' 2009 guidance, defendants knew that: (i) Celera's BHL division was losing clients because of Celera's new policy of billing patients for unpaid balances as well as collection efforts from individual patients for previously rendered services; (ii) when Celera sent collection letters to Blue Cross/Blue Shield individual patients in early January 2009, *sales numbers had dropped immediately and significantly*; (iii) there was a *drop in business* after Celera had started billing patients directly for new tests *in 2008* because most insurance companies did not recognize and would not pay, causing a negative response from patients and physicians; and (iv) BHL sales volume reports demonstrated a loss of clients since mid-2008. Defendants, according to a former Celera Director of Finance, received and constantly reviewed various iterations of the budgets and forecasts for the BHL segment, reports that would have informed them of the underlying data that rendered Celera's 2009 guidance false.  These adverse facts seriously undermined defendants' revenue guidance for 2009 and yet, defendants would reiterate this same false guidance on May 6, 2009.

17.     On July 22, 2009, defendants' game of hide-the-ball with Celera's bad debt ended when Celera announced that it "expects to record significant charges in the second quarter of 2009 for bad debt expense . . . ."  And defendants would announce that Celera was withdrawing its previous 2009 guidance as a result of "lower than anticipated sample volume due to broad economic

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                                                                    - 6 -

1  pressures, lost business as a result of the Company's efforts to collect aged receivables, and the

2  denial of reimbursement on a number of legacy BHL tests . . . ."

3          18.     As a consequence of defendants' July 22, 2009 revelations, Celera's stock closed on

4  July 23, 2009, down nearly 25% from $7.74 per share one day earlier.

5          19.     On August 6, 2009, defendants would add detail to their July 22, 2009 disclosures,

6  reporting: (i) a bad debt expense of $20.1 million for the three months ending June 27, 2009, and a

7  total of $25.2 million for the six months ending June 27, 2009; and (ii) an allowance for doubtful

8  accounts of $39.2 million – an 86% increase over the prior quarter and a stunning 360% increase

9  over the prior year.  Citing lost accounts as a result of their collection efforts, defendants would also

10  take down Celera's 2009 revenue guidance by more than $30 million to $160 to $170 million for

11  2009, a 16% drop, increase SG&A expense from $102 to $112 million guidance to $110 to $118

12  million, and report that BHL's sample volume grew by a mere 2%.

13          20.     Celera's 2Q 2009 Form 10-Q, filed on August 11, 2009, explained that the increase in

14  bad debt expense was due to:

15          *[T]he provision for the Lab Services' accounts receivable over 360 days old*, tests
         that have been denied for reimbursement and an assessment of the collectability of
16          aged accounts receivable based on past collection experience. *These balances were
         primarily due from patients*.

17          21.     Further, Celera admitted in its 2Q 2009 Form 10-Q that a "*significant amount*" of its

18
19  increase in the Company's allowance for doubtful accounts was "*due to some non-contracted

   *payors sending payment for our services to their beneficiaries instead of to us*."  Thus, disclosing

20  to investors the very issue that had impaired Celera's receivables since the beginning of the Class

21  Period.

22                              **JURISDICTION AND VENUE**

23          22.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934

24  Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R.

25  §240.10b-5).

26          23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

27  §1331 and §27 of the 1934 Act.

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                        - 7 -

24. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Celera maintains its headquarters in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

25. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

26. Celera's principal executive offices are located at 1401 Harbor Bay Parkway, Alameda, California.

**PARTIES**

27. Plaintiff Washtenaw County Employees' Retirement System ("WCERS") purchased Celera common stock as described in the attached certification and was damaged thereby. WCERS was appointed by the Court as lead plaintiff of this action in September 2010.

28. Defendant Celera is headquartered in Alameda, California and delivers personalized disease management through a combination of products and services. It operates in three segments: Lab Services, Products, and Corporate. The Lab Services segment was formerly BHL and offers clinical laboratory tests and disease management services for healthcare providers. The Products segment develops and manufactures molecular diagnostic products for disease detection, prediction of disease predisposition, monitoring of disease progression and disease severity, and determination of patient responsiveness to treatments. The Corporate segment licenses small molecule drug development programs and intellectual property to third parties for use in the diagnostic field.

29. Celera employs approximately 600 employees. As of September 2008, approximately 40 of those employees were in the sales organization of Celera's BHL division and another 80 clinical professionals supported customers and physicians. According to a March 2008 conference call, approximately 225 Celera employees work in the areas of discovery, development, manufacturing and registration of products.

30. Defendant Kathy Ordoñez is, and at all relevant times was, Chief Executive Officer ("CEO") and a director of Celera. Ordoñez signed or authorized the signing of the false and misleading Form S-1/A Registration Statement ("Registration Statement") filed in connection with

1  the split-off. Ordoñez also signed or authorized to be signed Celera's fiscal year-end 2008 Form 10-

2  K, calendar 3Q 2008 Form 10-Q, calendar year-end 2008 Form 10-K and calendar 1Q 2009 Form

3  10-Q.

4       31.    Defendant Joel R. Jung ("Jung") was, until April 6, 2009, Chief Financial Officer

5  ("CFO") of Celera during the Class Period. At that time, Celera and defendant Jung had reached an

6  agreement whereby defendant Jung would resign. Jung signed or authorized the signing of the false

7  and misleading Registration Statement filed in connection with the split-off. Jung also signed, or

8  authorized to be signed, Celera's FY 2008 Form 10-K, calendar 3Q 2008 Form 10-Q and calendar

9  year-end 2008 Form 10-K. Defendant Jung served as Vice President ("VP"), Finance of Applera

10  before Celera's split-off. He also served as VP and Treasurer and VP, Finance for Chiron

11  Corporation's Blood Testing Division prior to joining Applera. He holds an M.B.A. from the Haas

12  School of Business at the University of California, Berkeley.

13       32.    Defendant Ugo DeBlasi ("DeBlasi") was appointed CFO of Celera on April 6, 2009.

14  Commencing earlier in 2009, DeBlasi served as a consultant to Celera. He previously had served as

15  Chief Accounting Officer, VP and Controller of Applera, Celera Group's parent company, from

16  2003 to 2008. Defendant DeBlasi was a Senior Auditor for PricewaterhouseCoopers prior to joining

17  Applera, has a B.S. in Accounting and is a CPA. DeBlasi signed Applera's fiscal 3Q 2008 Form 10-

18  Q, which included Celera's financials and Celera's 1Q 2009 Form 10-Q. On October 4, 2010,

19  Celera announced defendant DeBlasi was leaving the Company effective November 19, 2010.

20       33.    Christopher Hall served as Celera's Chief Business Officer of Berkeley HeartLab

21  since October 2008. Prior to Celera's acquisition of BHL, Hall was its Chief Clinical Operations

22  Officer from 2005-2008 and also served as its VP of Marketing. Defendant Hall left Celera in

23  February 2010. Defendant Hall made false and misleading statements regarding the financial

24  condition and prospects of Celera's BHL division on conference calls and authorized the issuance of

25  financial information in press releases and SEC filings as detailed herein.

26       34.    The defendants referenced above in ¶¶30-33 are referred to herein as the "Individual

27  Defendants."

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)        - 9 -

35.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Celera's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  While at Applera, and then Celera, the Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## CONFIDENTIAL WITNESSES

36.     CW1 was employed at BHL since the early 1990s and remained with BHL/Celera until he[5] left in July of 2009.  For several years, including during the Class Period, he was a Senior Billing Manager who was responsible for supervising more than twenty subordinate personnel and ensuring that BHL's billing was sent to clients.  In addition, CW1 had overall management of BHL's accounts receivables, collections as well as preparing reports at month-end regarding the status of BHL's receivables.  CW1 reported to Gary Tom (Director of Finance and Accounting) for some time prior to Celera's acquisition of BHL and then a few months following the acquisition.  CW1 then reported to Celera's Controller, Stan Dziemien, who reported to defendant Jung and later defendant DeBlasi.

37.     CW1 indicated that ***collection efforts from Blue Cross patients contributed to BHL/Celera losing business***.  CW1 explained that in early 2008, Blue Cross began sending payments directly to patients who were, in turn, supposed to send payments to BHL for tests services rendered.  CW1 indicated that Blue Cross' practice of remitting payments to individuals, not BHL,

---

[5]     The use of the words "he," "his" and "him" in connection with CWs is not meant to be gender specific and shall also be meant to pertain to the female gender.

1    continued until at the earliest Celera/BHL contracted with Blue Cross of Alabama (April 2009).  In

2    approximately April 2008, there was *a big increasing trend in unpaid receivables owed by Blue*

3    *Cross* on a daily basis, which resulted in a tremendous effort by BHL/Celera to determine the basis

4    for this noticeable increase.  At that time, CW1 and Celera management, including its controller Stan

5    Dziemien, knew that Blue Cross had changed their practices and started sending payments directly to

6    patients, not to BHL.

7          38.     By approximately late 2008, BHL/Celera had made some collection efforts but

8    retained Deloitte & Touche to assist in collection efforts owed by Blue Cross patients.  CW1

9    indicated, however, that BHL/Celera ran into problems obtaining payment because it had been so

10   long since the patients had received checks from Blue Cross.  CW1 further explained that many

11   patients were upset on receipt of the letters and complained to their physicians.  In turn, CW1

12   indicated that physicians were angry at BHL/Celera for their collection efforts directly from the

13   patients.

14         39.     CW1 explained that BHL/Celera's change in billing practices in January 2009 was

15   even more controversial than billing patients directly.  In January of 2009, CW1 elaborated,

16   BHL/Celera changed their billing policy to start billing patients for the amount that their insurance

17   companies did not pay.  BHL's sales force was tasked with explaining to physicians BHL/Celera's

18   new collection efforts (both the change to billing patients for the balance not paid by insurance

19   companies and the efforts to collect from Blue Cross patients) and that even before the sales force

20   communicated the policy changes to their clients it was anticipated that patients and physicians were

21   going to be upset.  CW1 explained that BHL/Celera lost clients (*i.e.*, physicians) once BHL/Celera

22   instituted its new policy of billing patients for the unpaid balances.  CW1 indicated that defendant

23   Hall and Celera's Controller Stan Dziemien communicated the policy change at a steering committee

24   meeting which occurred every month and included representatives from each of BHL's major

25   departments.

26         40.     CW1 also stated that despite knowledge that UnitedHealth Group ("UnitedHealth")

27   considered certain tests investigational and would not reimburse for the tests, BHL/Celera billed for

28   the full amount of these tests (approximately $400 per bill).  UnitedHealth used electronic remittance

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                                                    - 11 -

1   which meant that BHL/Celera would receive a file from UnitedHealth clearing house and the monies

2   received from UnitedHealth would be automatically posted to the oldest receivables owed by

3   UnitedHealth, including the non-reimbursable tests.  As a result, it was necessary for Celera to

4   manually adjust the payments applied to the non-reimbursable receivables and manually write-off

5   the receivable. CW1 indicated that it could take six months before these manual adjustments were

6   made.

7         41.   The month-end reports that CW1 generated regarding receivables depicted all of

8   BHL's receivables from BHL's start (*i.e.*, 1990) onward and various aging buckets (0-30 days, 31-60

9   days, 61-90 days and so forth).  The monthly reports showed precisely what was owed and by whom

10  and were derived from a MISYS billing system, which CW1 transferred into an Access format.

11        42.   CW2 joined BHL in December 2006 and was promoted to District Manager of

12  Clinical Operations for the Western Region in October 2007, a position he maintained at

13  BHL/Celera until July 23, 2009.  CW2 acted as a liaison between BHL's sales personnel who dealt

14  directly with physicians and BHL's clinical staff.  His duties also included educating BHL sales

15  personnel about BHL's services and developing relationships with physicians and ensuring patients

16  received education and coaching.  The Western Region was one of BHL's three geographic regions

17  – the others being the Central and Southeastern Regions of the United States.  CW2 reported to the

18  Western Region Manager, Sue Kirst, who, in turn, reported to defendant Hall.

19        43.   CW2 indicated that BHL's test services had been suffering for approximately six

20  months prior to his departure in July 2009.  CW2 attributes the decline in business that began in

21  early 2009 as a direct result of changes that Celera initiated regarding the billing for BHL's services

22  and Celera's efforts to collect directly from patients for previously rendered services.

23        44.   CW2 explained that the bills for the lab services were generated from BHL's main

24  facility in South San Francisco.  CW2 elaborated that BHL's test services were not recognized by

25  any HMO plan.  Thus, a patient covered by an HMO would be liable for the full amount charged.

26  With respect to PPOs, there were two distinct ways of billing: (i) direct pricing; and (ii) no balance

27  billing.  No balance billing meant that patients were not supposed to be billed directly for any

28  amounts the PPO did not pay BHL.  However, patients would receive an Explanation of Benefits

1  ("EOB") which would make it appear as if the patient was obligated to pay an amount not covered

2  by the PPO.  Patients would sometimes complain to their doctors upon receipt of the EOB.

3  Physicians, in turn, would complain to BHL.

4       45.    CW2 stated that in early 2009, Celera management changed the no balance billing

5  arrangement so that going forward patients would have to pay the balance not covered by the PPO.

6  CW2 explained that it was the sales personnel who were supposed to inform each physician on an

7  account by account basis.  Sales personnel immediately recognized that this new billing policy

8  would be detrimental to future business and commented to CW2 their dismay, including that their

9  accounts were going to be destroyed.  CW2 worked closely with the sales representatives and

10 discussed the consequences of the change in billing practices with the ones in Southern California on

11 a weekly or bi-weekly basis.  Once physicians were informed of the new practice, CW2 indicated

12 that they also began to complain.  The physicians complained directly to CW2 as well as to his boss,

13 Sue Kirst.  CW2 explained that he discussed the physician complaints with Sue Kirst and that it was

14 clear that physicians would no longer use BHL as a result of the change in billing practices.

15      46.    CW2 further elaborated that Blue Cross/Blue Shield was a PPO that had a no balance

16 billing arrangement with BHL.  However, CW2 indicated that Blue Cross/Blue Shield reimbursed

17 patients (not BHL) for the tests that had been rendered by BHL.  The patient was supposed to remit

18 payment to BHL, but in practice, CW2 indicated that patients did not pay BHL.  Prior to Celera's

19 acquisition of BHL, BHL *did not try to collect monies owed from the patients.  Only early in 2009*

20 *did Celera send collection letters to patients*.  CW2 understood that BHL's PPO arrangement with

21 Blue Cross/Blue Shield was *a main contributor to BHL's uncollected debt problem*.  CW2

22 indicated that once the collection letters were sent out, patients complained to their physicians about

23 the letters and, in turn, BHL/Celera received angry responses from the physicians, including scathing

24 e-mails to BHL sales representatives, which CW2 personally reviewed, and angry phone calls that

25 CW2 was informed of through discussions.  CW2 indicated that *sales numbers dropped*

26 *significantly* and immediately after the collection letters were sent out.

27      47.    Due to CW2's direct interaction with sales personnel, CW2 was very aware that

28 physicians were upset that their patients received bills and requests for payment from Celera for

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                                        - 13 -

1    previously rendered services.  As a result, physicians stopped ordering BHL tests for their patients.

2    CW2 indicated *the loss of business was notable throughout the four to six months prior to CW2's*

3    *departure in July 2009*.

4         48.    As a result of his communications with many individuals who worked in the Central

5    and Southeastern Regions, both while he worked at BHL/Celera and after he left, CW2 is

6    knowledgeable about those regions as well.  For example, CW2 indicated that a particularly large

7    number of accounts with no billing balance issues were located in the Southeast region.  CW2 also

8    elaborated that *BHL/Celera lost upwards of 40% of its business in the Southeast*.

9         49.    CW3 was a Director of Finance at Celera from October 2008 to March 2009.  He

10   reported directly to Celera's Controller.  As part of his position, he assisted in preparing BHL's

11   budget and forecast for the upcoming fiscal year to be presented to Celera's Board of Directors.  His

12   primary role was collecting information and insuring it was inputted into a matrix format.  For

13   example, he received information regarding BHL's accounts receivables, allowances for bad debt

14   and uncollectible receivables from Celera's Controller and ensured the data was correctly inputted.

15        50.    CW3 explained that BHL's budgets/forecasts included different outcomes depending

16   on the various assumptions used.  To forecast various financial results, Celera financial personnel

17   would alter a particular business practice in their model to determine the financial results as a result

18   of the alteration.

19        51.    CW3 further explained that actual monthly results were compared to forecasted goals

20   and that a variance analysis would be conducted to determine the reasons for any deviations.  CW3

21   also indicated that Celera's Controller and other finance personnel were modeling the impact of

22   contracting with insurance providers on Celera's A/R reserves.  Celera's Controller explained to

23   CW3 that BHL would bill uncontracted insurance providers the full retail amount of the service

24   provided, even though it understood that the insurance company would only pay a portion.  The

25   effect of billing the full retail value for services was higher top-line revenue but increased A/R

26   reserves, thereby reducing the bottom-line.  CW3 understood from speaking with Celera's Controller

27   that Celera was trying to add more contractual relationships.

28

52.     CW3 explained that the various iterations of the budgets and forecasts he helped to prepare were subject to constant review by senior executives, including the CFO (defendants Jung and then DeBlasi), the CEO (defendant Ordoñez) and defendant Hall.  According to CW3, when DeBlasi came to Celera, his first emphasis was on completing the budgeting cycle for the upcoming year.

53.     CW4 is a former District Sales Manager employed by BHL from October 2005 until approximately January 2010.  CW4 reported to Regional Manager Clark Robinson, who, in turn, reported to Scott Bland and then defendant Hall, after defendant Hall began reporting to defendant Ordoñez.

54.     CW4 was a top-performing sales representative for each of the years he worked at BHL/Celera.  His salary in his top-producing year exceeded $600,000.  CW4 understood that his contributions and one other sales representative's contributions represented 60% of BHL's total revenue at one time.  CW4 explained that, despite being a top-producing sales representative, changes in sales commission structure caused him to receive no commission in 2009.

55.     CW4 indicated that BHL had a commissions structure whereby the sales achieved by the sales representative in the preceding 12 months became the baseline that the sales representative needed to surpass in the ensuing 12 months in order to be eligible for commissions.  After Celera acquired BHL, it initially maintained this commission structure, referred to as a 12-over-12 structure.  Shortly after, however, Celera switched to a 6-over-6 structure whereby the sales representatives preceding six month sales had to be exceeded in the upcoming six month period.  By 2009, however, Celera changed the commission structure to a quarter-over-quarter model, which required the sales representatives to exceed the sales of each preceding quarter to be eligible for a commission.  CW4 explained that even though his sales exceeded other sales representatives by several multiples he began receiving no commission.

56.     Celera also placed an emphasis on sales of Celera's genetic tests rather than BHL's test panels.  CW4 explained that BHL's test panels revealed a variety of medical conditions that were treatable by different drugs and therapies requiring re-tests to determine patients' responses to

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                                                                    - 15 -

1  these therapies.  Celera's genetic tests, including KIF6, were mostly administered a single time

2  instead of on a recurring basis like BHL's test panels.

3       57.    CW4 further elaborated that the emphasis on the genetic tests was undercut by the

4  fact that the data that supported the KIF6 test was authored by Celera employees.  CW4 explained

5  that data was reported in a published medical journal towards the end of 2009 that contradicted the

6  claims made by Celera regarding the KIF6 test.  CW4 indicated that an abstract was issued in

7  advance of this article and he had personally became aware of the negative data regarding KIF6 in

8  July 2009.  CW4 attempted to discuss his concerns regarding withholding the negative data

9  concerning KIF6 with his superiors but was essentially told to keep his opinion to himself.

10       58.    CW4's knowledge regarding receivables stems from the impact they had on his

11  commissions.  CW4 explained that sales personnel received a commissions report which detailed the

12  number of tests performed and billed within a given period as well as the amounts backed out

13  because the tests had purportedly not been reimbursed by the patient's insurance company.

14       59.    With respect to Medicare, CW4 understood that BHL/Celera would accept as

15  complete payment whatever Medicare reimbursed and not make any effort to collect the remaining

16  balance.  CW4 stated that BHL and later Celera also sought reimbursement from commercial

17  insurance companies through the clear price program.  This program involved billing for the full

18  retail amount for the testing services performed.  The patient's commercial insurance company

19  would pay a certain amount and BHL/Celera would then bill the individual patient for additional

20  sums.  CW4 elaborated that BHL had committed to not increasing the amount patients would be

21  liable for, approximately $109 to $159 depending on the testing services provided.  Thus, a panel of

22  tests would be billed at the full retail value.  For instance, a panel might be billed for $1,500 and the

23  insurance company might pay $250 and the patient would be billed $109 to $159; the remainder of

24  the unpaid balance would be written off.

25       60.    In contrast, CW4 explained that zero balance billing was extended to Medicare and

26  certain commercial insurance payers.  With zero balance billing, BHL/Celera invoiced the payor the

27  full retail amount but accepted the monies paid by these payors and did not bill or collect from the

28  patients.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)              - 16 -

1    61.    Celera, according to CW4, took over BHL's billing. CW4 stated that Celera added

2 new tests *most insurance companies did not recognize and thus would not pay*. In approximately

3 October 2008, Celera began passing along the charges for the new tests directly to the patients,

4 which typically increased the amounts owed by the patients by $20 per new test, in addition to the

5 $109 to $159 that had been previously represented to them as the amounts they would have to pay.

6 CW4 indicated that towards the end of 2008, patients and physicians were negatively responding to

7 this change and that *by the beginning of 2009 there was a noticeable change in terms of patient*

8 *and physician responses and an attendant drop in business*.

9    62.    CW4 also stated that *around the end of 2008* Celera management also discontinued

10 or reduced the ancillary clinical services and support that had been provided to patients; services that

11 had been valued by physicians. CW4 indicated that this change along with the change in billing

12 resulted in *Celera losing customers left and right*. CW4 further indicated that *from mid-2008*

13 *onward volume reports reflected that there were week-over-week losses of physician accounts*.

14 The volume reports showed how much business was being generated from each physician's office

15 and demonstrated *significant loss* of business activity from numerous physicians.

16                **OVERVIEW OF CELERA'S FALSE FINANCIAL STATEMENTS**

17    63.    In order to inflate the price of Celera securities, defendants caused the Company to

18 falsely report its financial results for the third quarter of fiscal 2008 ended March 31, 2008, for the

19 fiscal year-ended June 30, 2008, for the third and fourth quarters of calendar 2008 and for the first

20 quarter of calendar 2009 by failing to properly account for its bad debts, which overstated the

21 Company's assets, net income and earnings and understated its SG&A expenses.

22    64.    Celera's Class Period financial results were included in Forms 10-K and Forms 10-Q

23 filed with the SEC. The results were also included in press releases disseminated to the public.

24 Defendants' SEC filings claimed that the financial information presented therein was a fair statement

25 of Celera's financial results and that the results were prepared in accordance with GAAP.[6]

26 _____

27 [6]    GAAP are those principles recognized by the accounting profession as the conventions, rules
28 and procedures necessary to define accepted accounting practice at a particular time. SEC

65.     Defendants violated GAAP and SEC rules because said financial information was not prepared in conformity with applicable GAAP and SEC requirements, nor was the financial information a fair presentation of the Company's operations.  Defendants did so by failing to adequately reserve for or write-down the value of Celera's impaired A/R in a timely manner.  As a result, Celera's net A/R was materially overstated and its bad debt expense (a component of SG&A expenses), net loss and net loss per share were understated during the Class Period.

**GAAP Requires Adequate A/R Reserves**

66.     Under GAAP, a loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to possible loss.  *See* Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies*, ¶1.[7]  The collectibility of a company's accounts receivable is an example of a loss contingency.  GAAP requires that an estimated loss from a loss contingency be accrued by a charge to income if both of the following conditions are met: (a) information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (b) the amount of loss can be reasonably estimated.  *See* SFAS No. 5, ¶8.  Celera failed to accrue for known bad debts.

67.     Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS No. 5 are not met, or if an exposure to loss exists in excess of the amount accrued, defendants were still required to disclose the contingency where there is at least a

---

Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP.  17 C.F.R. §210.10-01(a).

[7]     On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued SFAS No. 168, *The FASB Accounting Standards Codification*™ ("ASC"), which became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that end after September 15, 2009.  The codification did not change existing U.S. GAAP.  These allegations use the historical references to U.S. GAAP, as such references existed during the Class Period.

1   "*reasonable possibility*" that a loss or an additional loss may have been incurred.[8]  *See* SFAS No. 5,

2   ¶10.  Celera made no such disclosure.

3         68.    Similarly, GAAP requires "[a]n expense or loss [to be] recognized if it becomes

4   evident that previously recognized future economic benefits of an asset have been reduced or

5   eliminated . . . ."  *See* Statement of Financial Accounting Concepts ("SFAC") No. 5, *Recognition*

6   *and Measurement in Financial Statements of Business Enterprises*, ¶87.

7   **Celera Knew Accounts Receivable Was Likely Uncollectible and Violated GAAP**

8         69.    During the Class Period, Celera failed to adequately maintain its allowance for

9   doubtful accounts in its Lab Services segment (BHL).  Celera's largest business segment is its

10  clinical laboratory testing (Lab Services) business segment, with over 60% of its revenue being

11  associated with this segment.  Defendants were aware of many red flags indicating that a significant

12  amount of the BHL A/R was uncollectible and that the allowance for doubtful accounts was

13  inadequate and in violation of GAAP.   These red flags included knowledge of denied

14  reimbursements; the majority of payors were non-contract insurers and individuals; reimbursements

15  sent from the insurer to the patient instead of to the Company; excessive DSO; and the allowance as

16  a percentage of net receivables was increasing.

17  **Reimbursement Was Denied or Sent to Patients Instead of Celera and Most Customers**
    **Were Non-Contract Insurers and Individuals**

18

19        70.    Celera's clinical testing revenue is highly dependent upon its testing being approved

20  for reimbursement by third-party payors, including private, for-profit health insurance companies

    and government programs such as Medicare.  If a third-party payor denies reimbursement, then the
21
    amount owed to Celera is due directly from the patient, which increases Celera's collection costs and
22
    risks.
23

24        71.    Celera has entered into contracts with certain third-party payors to become in-network

25  providers.  Revenue from contract payors is based on the contract rate and in the case of Medicare on

26

27  [8]    GAAP defines "reasonably possible" as "[t]he chance of the future event or events occurring
    is *more than remote but less than likely*."  *See* SFAS No. 5, ¶3.

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)         - 19 -

1   published fee schedules.  Typically, the contracted rate is at a reduced rate and is lower than the rates

2   paid by non-contract payors.  However, revenue from contract payors is more predictable and carries

3   with it less collection risks.  Because of this, Celera wanted to increase the amount of its Lab Service

4   business that was under contract, but was unable to substantially do so during the Class Period, and,

5   thus could not reduce its known exposure to uncollectible accounts receivable.

6         72.      The largest portion of Celera's Lab Services revenue was reported to be from non-

7   contract payors on an out-of-network provider, non-participating basis.  As an out-of-network

8   provider, the Company does not have a contracted reimbursement rate with the third-party providers

9   and may charge the payor a higher rate.  However, the revenue earned as an out-of-network provider

10   carries with it increased risks that the third-party payor may deny the claim.  In addition, when

11   certain of Celera's non-contract payors – such as Blue Cross/Blue Shield – do approve claims, they

12   send the reimbursement payments directly to the patients instead of to Celera.  The Company then

13   has to collect the outstanding amounts directly from patients, increasing the amount of time and

14   effort the Company is required to spend to collect on its accounts receivables and increasing the

15   overall probability of the accounts being uncollectible, particularly during the economic weakness

16   and concerns regarding consumer spending during the Class Period.  This risk was exacerbated by

17   the fact that BHL had not tried to collect the monies owed by patients who had received checks from

18   Blue Cross/Blue Shield, which insures approximately 20% of BHL's sample volume, for months

19   after services rendered.  Thus, these receivables were long outstanding and the quality of the

20   receivables was impaired and required additional reserves, as it is well-established that there is an

21   increased risk inherent in older receivables.

22   **Celera's DSO During the Relevant Period Was Excessively High and Well Above the Industry Norm**

23

24         73.      DSO is a common financial metric that represents the average number of days it takes

25   a company to collect its receivables.  It is a measure of collectibility and also serves as a useful

     measure of cash flow efficiency and revenue quality.  A DSO of 40, for example, means that it takes

26   a company 40 days on average to convert a credit sale (*i.e.*, an account receivable) into cash.  An

27   abnormally high DSO, in comparison to a relevant benchmark, is a sign that receivables are at risk of

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                          - 20 -

collection and may indicate problems with the collection process at the company.[9]  As such, DSO is a widely used metric associated with measuring the quality of a company's accounts receivable portfolio.  The significance of this metric has been made clear by the SEC: *See, e.g.*, "[a] growing DSO figure is often a telltale sign that a company's receivables are impaired."[10]  This is because the older a receivable gets, the less likely it is to be collected.

74.    Industry DSO figures were readily available to defendants during the Class Period.  Various professional organizations publish healthcare DSO information and industry averages.  The median industry DSO at the end of 2008 was 40 days.  This was calculated by dividing net accounts receivable by net revenue for the year and then multiplying by 365 days.[11]  Similarly, the median DSO for Celera's peer companies was approximately 45 days and the average DSO was around 60 days.[12]  Comparatively, using an equivalent formula, Celera's DSO was more than double at 92 days at the end of 2008.  The following chart depicts Celera's abnormally high and escalating DSO:

| Quarter ended 12/31/07 | | Quarter ended 3/31/08 | | Quarter ended 6/30/08 | | Quarter ended 9/27/08 | | Quarter ended 12/27/08 | | Quarter ended 3/28/09 | | Quarter ended 6/27/09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68 | | 75 | | 84 | | 89 | | 92 | | 98 | | 68 |

---

[9]    *See* David C. Hammer, *Performance is reality, how is your revenue cycle holding up?*, Healthcare Financial Management Association (July 1, 2005); *see also* Michael D. Carpenter, *A Reliable Framework for Monitoring Accounts Receivable*, Financial Management Vol. 8, No. 4 at 37-40 (Winter 1979); Scott Blakeley, Esq., *The Credit Professional's Duty and Protection with Disclosing Corporate Fraud at the Public Company*, The Credit Research Foundation at 2 (November 2002) ("A company's DSO is, at least on Wall Street, an important indicator of the condition of its accounts receivable, and therefore a gauge of asset quality.").

[10]    *See SEC v. Korkuc*, No. 03-cv-3017, Complaint, ¶28 (E.D.N.Y., June 19, 2003); *see also* SEC AAER No. 1673A (Nov. 25, 2002), *available at* http://www.sec.gov/litigation/litreleases/lr17859a.htm.

[11]    Net accounts receivable is derived by subtracting the allowance for doubtful accounts from gross accounts receivable.  Net revenue represents sales billed to Celera's customers less an appropriate contractual allowance.

[12]    Celera lists its "peer companies" in its September 9, 2008 Form 10-K and selects its peers based on the following criteria: (a) engaged in the Life Sciences industry; (b) located in high cost of living areas; (c) have revenues generally less than $400 million; (d) have generally 200 to 1000 employees; and (e) have a market capitalization between $300 million and $3 billion.

75.     Additionally, month-end reports were generated which detailed the aging of all of BHL's receivables from 1990 onward.  The receivables were shown in various aging buckets (0-30 days, 31-60 days, 61-90 days, *etc.*).  It was clear in the monthly reports how much the Company was owed by various payors and for how long.  Thus, defendants had knowledge of the increasing age of the outstanding receivables and the associated inherent risk which required additional reserves in accordance with GAAP.

**Celera's Allowance as a Percentage of Net Receivables Was Steadily Increasing**

76.     The allowance for doubtful accounts as a percentage of net receivables is a commonly used and available metric that is relevant to the issue of collectibility and quality of accounts receivable.  It is a useful metric for management to measure changes in accounts receivable over time because the allowance for doubtful accounts generally has an inverse relationship to the average age of accounts receivable – as receivables age, they are more difficult to collect and thus require a higher allowance less applicable write-offs.  Accordingly, all else remaining equal, a flat or increasing allowance as a percentage of net receivables over time indicates the aging of the underlying receivable portfolio is not improving or is getting worse.

77.     Early in the Class Period, the Company's allowance for doubtful accounts as a percentage of its net receivables was 21.5% at June 30, 2008.  During the Class Period, defendants repeatedly assured investors that the Company would be able to increase the amount of its Lab Services business that was under contract.  Defendants further assured investors that the Company was adequately reserving for its bad debts.  Despite these assurances, Celera's allowance as a percentage of net receivables increased each quarter.  It doubled to 42.6% by March 28, 2009, and by June 27, 2009, at the end of the Class Period when defendants finally wrote off A/R that had long been impaired including A/R more than a year overdue, the ratio jumped to an astounding 126.8%.  For comparative purposes, the allowance for doubtful accounts as a percentage of net receivables for Celera's publicly traded "peer companies" was generally only less than 10% during 2007, 2008 and 2009.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                                                                    - 22 -

78.     The chart below reflects rather than sufficiently accruing for Celera's impaired A/R, defendants dramatically increased the provision and allowance for doubtful accounts at the end of the Class Period:



79.     The dramatic increase in Celera's provision at the end of the Class Period was primarily due to the provision for BHL's accounts receivable over 360 days old and for tests that were denied for reimbursement by a third-party payor – *i.e.*, receivables that defendants were well aware throughout the Class Period would likely be uncollectible.  At the end of the Class Period, Celera announced that it had made the decision to write-off all accounts over 360 days old.  In general, longer term and older receivables carry a greater credit risk.  These accounts typically involved amounts due from individual patients, which further increased the Company's credit risk. Celera further announced that it had decided to write-off all accounts where a third-party insurer had previously denied reimbursement for lab services and the amounts outstanding were now due from

1   the patients themselves.  In general, receivables owed directly from a patient carry a greater credit

2   risk than a receivable owed from a private insurance company.

3   **Defendants' Knowledge**

4          80.     Defendants knew by the start of the Class Period that the types of Celera's receivables

5   described above were likely impaired.  These include A/R in which defendants had knowledge of the

6   following characteristics: (a) reimbursements had been or would be denied; (b) the payors were

7   individuals or non-contract insurers; (c) reimbursements were sent from the insurer to the patient

8   instead of to Celera; and (d) the A/R was well overdue.  As such, bad debt expense should have been

9   incurred (*i.e.*, the allowance should have been increased or the A/R written off) beginning no later

10  than March 31, 2008.  Defendants improperly delayed incurring such an expense in order to avoid

11  the negative impact on its net income and earnings for as long as possible.  Ultimately, the $20.1

12  million charge taken in 2Q 2009 resulted in a net loss for the quarter of nearly $32 million, or 97%

13  of the net loss for the entire fiscal year.  This $20.1 million charge was more than the aggregate bad

14  debt expenses for the previous four quarters combined and it was more than double the bad debt

15  expense reported for the entire fiscal year ended June 30, 2008.  The fact that such an abnormally

16  excessive charge was taken in one quarter is indicative of the Company under reserving for doubtful

17  accounts in prior quarters.

18  **Other GAAP Violations**

19         81.     In addition to the GAAP and SEC violations described above, the Company also

20  violated the following fundamental GAAP principles:

21                 (a)     The principle that interim financial reporting should be based upon the same

22  accounting principles and practices used to prepare annual financial statements was violated

23  (Accounting Principles Board Opinion No. 28, ¶10);

24                 (b)     The principle that financial reporting should provide information that is useful

25  to present and potential investors and creditors and other users in making rational investment, credit

26  and similar decisions was violated (SFAC No. 1, ¶34);

27                 (c)     The principle that financial reporting should provide information about the

28  economic resources of an enterprise, the claims to those resources, and the effects of transactions,

1   events and circumstances that change resources and claims to those resources was violated (SFAC

2   No. 1, ¶40);

3        (d)   The principle that financial reporting should provide information about how

4   management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

5   for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

6   securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

7   accountability to prospective investors and to the public in general (SFAC No. 1, ¶50);

8        (e)   The principle that financial reporting should provide information about an

9   enterprise's financial performance during a period was violated.  Investors and creditors often use

10   information about the past to help in assessing the prospects of an enterprise.  Thus, although

11   investment and credit decisions reflect investors' expectations about future enterprise performance,

12   those expectations are commonly based at least partly on evaluations of past enterprise performance

13   (SFAC No. 1, ¶42);

14        (f)   The principle that financial reporting should be reliable in that it represents

15   what it purports to represent was violated.  That information should be reliable as well as relevant is

16   a notion that is central to accounting (SFAC No. 2, ¶¶58-59);

17        (g)   The principle of completeness, which means that nothing material is left out of

18   the information that may be necessary to insure that it validly represents underlying events and

19   conditions was violated (SFAC No. 2, ¶79); and

20        (h)   The principle that conservatism be used as a prudent reaction to uncertainty to

21   try to ensure that uncertainties and risks inherent in business situations are adequately considered

22   was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

23   represents what it purports to represent (SFAC No. 2, ¶¶95, 97).

24       82.   Additionally, defendants' improper accounting for impaired receivables was material,

25   given the SEC's guidance on materiality.  Staff Accounting Bulletin ("SAB") Topic 1M, *Materiality*,

26   summarizes GAAP definitions of materiality.  SAB Topic 1M represents the codification of certain

27   SAB's, including SAB No. 99, Materiality, as of May 9, 2003.  SAB No. 99 became effective

28   August 12, 1999.  SAB Topic 1M says, *inter alia*, "[a] matter is 'material' if there is a substantial

1  likelihood that a reasonable person would consider it important." It also stresses that materiality

2  requires qualitative, as well as quantitative, considerations. For example, considerations, such as

3  whether the misstatement concerns a segment of the business that has been identified as playing a

4  significant role in the company's operations or profitability (such as here), are factors that should be

5  taken into account in determining the materiality of the misstatement.

**DEFENDANTS' FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE CLASS PERIOD**

6

7

8  83.     Each of the following statements was made in a Celera press release, during a

conference call or in reports filed with the SEC to the public at large. Celera was traded on the

9  NYSE and then the NASDAQ and the public relied on the integrity of the efficient NYSE and then

10  NASDAQ markets to reflect all public information in Celera's stock price. Lead plaintiff and

11  putative class members suffered losses as a result of the artificial inflation of Celera's stock price

12  caused by defendants' materially false and misleading statements, the amount to be determined after

13  expert analysis and opinion.

14  **Defendants Falsely Reported Inflated Earnings and Understated Expenses for Fiscal 3Q

15  2008 and Misled Investors About Celera's Business**

16  84.     On April 24, 2008, Celera issued a press release entitled "Celera Reports Third

17  Quarter Fiscal 2008 Results," which stated in part:[13]

18          ***For the third quarter of fiscal 2008, Celera reported a net loss of $7.4
        million, or $0.09 per share***, compared to a net loss of $4.5 million, or $0.06 per

19      share, for the prior year quarter. Results for both periods were affected by the
        specified items described in the reconciliation below. Third quarter fiscal 2008 loss

20      per share on a non-GAAP basis, excluding the specified items described below, was
        $0.01, compared to a loss of $0.06 per share for the prior year quarter. All per share

21      amounts refer to Applera Corporation-Celera Group Common Stock.

22  85.     The April 24, 2008 press release also reported SG&A expenses as follows:

23          ***SG&A expenses for the third quarter of fiscal 2008 increased to $21.3 million*** from
        $7.1 million in the prior year quarter, ***primarily due to expenditures relating to BHL***

24      ***service revenues***.

25  _____

26  [13]     False and Misleading Statements are identified by bold italics for each of the paragraphs

27  identified in this section entitled Defendants' False and Misleading Statements Issued During the
     Class Period.

28

86.     On the same day, April 24, 2008, defendants Ordoñez, Jung and Hall participated in a conference call wherein defendants assured investors that Celera's BHL business was "insulate[d]" from consumer spending concerns and that there was "strong reimbursement across the board" for BHL's lab tests as follows:

**Derik De Bruin – *UBS – Analyst***

> I mean, given that – looking at the Berkeley Heart business and everything, how – is that potentially impacted at all by some of the consumer spending concerns that are going on?  Is it more of – do people tend to doing – (inaudible) other times – has there been a history of people going less to do those types of services in the past?

**Kathy Ordonez – *Celera – President***

> I don't think so, but I think I will ask Chris Hall to comment on that.

**Chris Hall – *Celera – Chief Marketing and Clinical Operations Officer***

> This is something that (technical difficulty) [with dynamics] that we haven't seen traditionally.  There's been a couple things that have underlined a business.  One has been that ***we're dealing with secondary prevention heart disease patients. So these are patients that have known disease, they have known issues, and their doctors pushing them into the program.  And I think that dynamic insulates us a little bit from the consumer spending, because – and we've seen that traditionally, because the doctor is driving it in the context of disease that's progressing.***

> ***The second piece of the business is that most of these patients pay minimal or very little out of pocket.***  Medicare is covering most of – covering everything that we're doing if the patient is a secondary prevention patient.  ***We're increasingly getting into network, and the PPO patients are paying sub-$100, because of the strong reimbursement across the board.***

> So, ***I think with the relatively small out of pocket, combined with the doctor pushing in the disease environment, we haven't seen, and we're not really expecting to see that occur over the next few quarters.***

87.     Defendants also assured investors on the April 24, 2008 conference call that its lab services consisted of "50% Medicare" and the remainder "[m]ostly out-of-network private reimbursement from the large insurance companies" as follows:

**Bill Quirk – *Piper Jaffray – Analyst***

> First question, can you help us think a little bit about the payor mix at Berkeley HeartLab?  I'm thinking largely kind of managed care versus self pay.

**Kathy Ordonez – *Celera – President***

> Sure.  It's about 50% Medicare.

**Joel Jung – *Celera – VP – Finance***

1    ***50% of the volume is Medicare**. Obviously, less than that percentage wise is
Medicare.  **The remaining balance is a mixture of private pay.  Mostly out-of-
2    network private reimbursement from the large insurance companies.***

3    88.    On May 8, 2008, Applera filed with the SEC its fiscal 3Q 2008 Form 10-Q which

4    included Celera's financial results.  The Form 10-Q was signed by defendant DeBlasi.  The Form

5    10-Q reiterated the false and misleading fiscal 3Q 2008 financials announced in the April 24, 2008

6    press release.  In particular, ***the Form 10-Q falsely reported that Celera had a 3Q 2008 loss of $7.4***

7    ***million, or $0.09 per share***, SG&A expenses for the third quarter of fiscal 2008 of $19.3 million

8    ***and net accounts receivable of $32.6 million***.

9    89.    The 3Q 2008 Form 10-Q also contained the following false and misleading

10   statements concerning Celera:

11          Receivables are reserved based on their respective aging categories.  ***Our process for
determining the appropriate level of allowance for doubtful accounts involves***
12          ***judgment, and considers the age of the underlying receivables, type of payor,
historical and projected collection experience, current economic and business***
13          ***conditions, and other external factors that could affect the collectibility of its
receivables***.  The allowance for doubtful accounts is reviewed for adequacy, at a
14          minimum, on a quarterly basis.  ***An account is written-off against the allowance for
doubtful accounts when all reasonable collection efforts have been unsuccessful***
15          ***and it is probable the receivable will not be recovered*** or the account has been
transferred to a third party collection agency.
16

**Reasons Why Defendants' 3Q 2008 Statements Were Materially False and Misleading**
17
18   90.    Defendants' statements regarding Celera's income (net loss of $7.4 million), and

19   earnings (a loss of $0.09 per share), and expenses for fiscal 3Q 2008 were knowingly false when

20   made.  The net loss and expenses reported by Celera were understated creating the impression that

     Celera's bottom-line was far healthier than it really was.
21
22   91.    Celera's reported income, earnings and expenses violated basic accounting standards

23   and were false.  Celera failed to adequately maintain its A/R reserves as required by SFAS No. 5

24   which requires that an estimated loss from a loss contingency be accrued by a charge to income if:

25   (a) information available prior to issuance of the financial statements indicates that it is probable

26   than an asset had been impaired (here, BHL's A/R); and (b) the amount of the loss can be reasonable

27   estimated.  *See* SFAS No. 5, ¶8.  Even if one or both of these conditions are not met (which they

28   were), defendants were still required to disclose the loss contingency where there is at least a

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                                    - 28 -

"reasonable possibility" that a loss or an additional loss may have been incurred.  *See* SFAS No. 5,

¶10.

92.     As described in detail in ¶¶63-82, defendants knew that it was probable that Celera's

A/R was impaired and that as a result the allowance for doubtful accounts recorded as of 3Q 2008

was materially inadequate in violation of SFAS No. 5 and GAAP, based on the following:

(i) approximately half of the Celera's lab service revenue was from out-of-network providers who were not contracted to pay a set amount for the services increasing the risk that the third-party payor may deny the claim or pay less than the billed amount;

(ii) that as described by CW1 and CW2 in ¶¶37-38, 46 and later admitted by defendants as described in ¶¶10, 21, Blue Cross/Blue Shield representing approximately 20% of the sample volume of BHL's lab services was remitting payment to individual patients, not Celera, thereby impacting Celera's collection activities and exposing Celera "to additional bad-debt risk";

(iii) that despite knowledge in April 2008 of a significant and noticeable trend in unpaid receivables owed by Blue Cross/Blue Shield and knowledge that Blue Cross/Blue Shield had been sending payment to individual patients for BHL test services since early 2008, Celera did not even send collection letters to these individual patients until the receivables had been outstanding for months and were virtually uncollectible according to CW1 and CW2 (¶¶37-38, 46);

(iv) that the DSO for fiscal 3Q 2008 was 75; a metric that was abnormally high compared to median industry DSO of 40;

(v) that the detailed aging reports described by CW1 in ¶41 informed defendants of the age of BHL's receivables and the associated payor; and

(vi) that the allowance for doubtful accounts as a percentage of net receivables, a common metric for assessing collectibility and the quality of receivables, was 23.2%; a metric that was far in excess of the 10% or less reported by Celera's publicly traded "peer companies."

93.     SEC filings confirm that defendants knew of the adverse factors that impaired

Celera's A/R and that disclosure would negatively impact Celera's receivables, income, EPS and the

Company's stock price.  For example, in 2Q 2008 defendants told investors:

With regard to patient test services, ***the Celera group has an established process to estimate and review the collectibility of its receivables based on the period of time the receivables have been outstanding***.  The Celera group's process for determining the appropriate level of the allowance for doubtful accounts involves judgment, and considers such factors as the age of the underlying receivables, historical and projected collection experience, and other external factors that could affect the collectibility of its receivables. ***The process includes the close monitoring of billings and the collection experience, which helps reduce the risks of material revisions to allowance estimates.***

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                                                                                  - 29 -

94.     By failing to increase Celera's allowance for doubtful accounts or write-off the impaired A/R, defendants inflated Celera's reported income and earnings and understated Celera's expenses, thereby inflating Celera's stock price.

95.     Additionally, Celera's 3Q 2008 Form 10-Q created the false impression that defendants were following Celera's stated process for reserving receivables and that reasonable collection efforts of the receivables were being made, when they had not.  According to CW1 and CW2, efforts to collect on Celera's aged receivables for Blue Cross/Blue Shield did not occur for many months after lab services had been performed (¶¶37-38, 46).

96.     In addition, defendants' statements at ¶¶86, 87 falsely created the impression that patients were paying little out of pocket (sub $100 for PPO patients) and that the payors for BHL's services were principally Medicare and private reimbursement from the large insurance companies. In truth, defendants knew they relied significantly on individual payors for reimbursement, including the Blue Cross/Blue Shield patients and individual patients who were paying $109-$159 according to BHL's top sales representative, as CW4 described in detail in ¶¶59, 61.  Indeed, defendants subsequently admitted in Celera's 2008 Form 10-KT, filed on March 25, 2009, that "[a] significant portion of [Celera's] accounts receivables [was] owed . . . by individual patients."  Defendants, however, would continue to conceal the negative financial impact of their reliance on individual patients for payment.

**Celera's June 2008 Registration Statement Falsely Created the Impression that Celera Properly Reserved for Doubtful Accounts and Incorporated Celera's Falsely Reported Fiscal 3Q 2008 Earnings and Expenses**

97.     On June 19, 2008, Celera filed with the SEC a Form S-1/A Registration Statement, which would be utilized for the split-off.  The Registration Statement was signed by defendants Ordoñez and Jung.  At the time, the Celera Group was a wholly-owned subsidiary of Applera and its shares traded as a tracking stock in the NYSE.  In the planned split-off, Celera Group would separate from Applera and become an independent publicly traded company.  Shares of the Celera Group tracking stock would be exchanged for shares of Celera in a one-for-one exchange.

98.     The Registration Statement contained financial results for the Company for the nine months ending March 31, 2008, which included Celera's fiscal 3Q 2008 results.  For the nine

months ending on March 31, 2008, *Celera falsely and misleadingly reported a net loss of $6.4 million, or $0.08 per share, net accounts receivable of $32.6 million and $7.6 million allowance for doubtful accounts*.

99.     Celera's Registration Statement also contained the following false and misleading statements:

> *Our revenues are highly dependent on our clinical laboratory tests being approved for reimbursement* by Medicare, as well as private insurance companies and managed care organizations, commonly referred to, collectively as "third-party payors." *Although most third-party payors currently have approved our clinical laboratory tests and the use of our diagnostic products for reimbursement, this could change if they determine that these tests and products are not medically necessary or otherwise not approved for reimbursement under* standards independently established by these third-party payors which may take into consideration factors such as the experimental nature of a particular test or product, or whether less expensive alternatives are available. . . . If Medicare or any other significant third-party payor determines that our clinical laboratory tests are not medically necessary or are not otherwise suitable for reimbursement, healthcare providers could be reluctant to prescribe these tests. Similarly, if the use of our diagnostic products is not approved for reimbursement, purchasers of these products could decrease or eliminate their orders of these products. *This could harm our operating results and financial condition.* Also, there can be no assurance that third-party payors will approve for reimbursement any clinical laboratory tests or the use of diagnostic products sold by us in the future.

>                    *        *        *

> We have an established process to estimate and review the collectibility of our receivables. *Our process for determining the appropriate level of the allowance for doubtful accounts involves judgment, and considers the age of the underlying receivables, the type of payor, historical and projected collection experience, and other external factors that could affect the collectibility of our receivables. The process includes the close monitoring of billings and our collection experience, which helps reduce the risks of material revisions to allowance estimates. An account is written-off against the allowance for doubtful accounts when all reasonable collection efforts have been unsuccessful* or the account has been transferred to a third party collection agency.

>                    *        *        *

> The Company estimates the difference between the Company's standard billing rates and Medicare's standard reimbursement rate and records this difference as a reduction of revenue at the time of billing. Further *adjustments*, if any, are based on revised reimbursement rates and *are recorded in the period in which they are realized.*

>                    *        *        *

> *Accounts receivable are reported at a realizable value, net of allowances for doubtful accounts, which is estimated in the period of the related revenue.*

**Reasons Why Celera's June 2008 Registration Statement was Materially False and Misleading**

100.    Celera's reported income, earnings and expenses and net A/R for the nine months ending 3Q 2008 incorporated into the Registration Statement were false.  Celera failed to adequately maintain its A/R reserves as required by SFAS No. 5 which requires that an estimated loss from a loss contingency be accrued by a charge to income if: (a) information available prior to issuance of the financial statements indicates that it is probable than an asset had been impaired (here, BHL's A/R); and (b) the amount of the loss can be reasonably estimated.  *See* SFAS No. 5, ¶8.  Even if one or both of these conditions are not met (which they were), defendants were still required to disclose the loss contingency where there is at least a "reasonable possibility" that a loss or an additional loss may have been incurred.  *See* SFAS No. 5, ¶10.

101.    As described in detail in ¶¶63-82, defendants knew that it was probable that Celera's A/R was impaired and that as a result, the allowance for doubtful accounts recorded for the nine months ending 3Q 2008 referenced in the Registration Statement, was materially inadequate in violation of SFAS No. 5 and GAAP for the following reasons:

(i) approximately half of the Celera's lab service revenue was from out-of-network providers who were not contracted to pay a set amount for the services, increasing the risk that the third-party payor may deny the claim or pay less than the billed amount;

(ii) that as described by CW1 and CW2 in ¶¶37-38, 46 and later admitted by defendants as described in ¶¶10, 21, Blue Cross/Blue Shield representing approximately 20% of the sample volume of BHL's lab services was remitting payment to individual patients, not Celera, thereby impacting Celera's collection activities and exposing Celera "to additional bad-debt risk";

(iii) that despite knowledge in April 2008 of a significant and noticeable trend in unpaid receivables owed by Blue Cross/Blue Shield and knowledge that Blue Cross/Blue Shield had been sending payment to individual patients for BHL test services since early 2008, Celera did not even send collection letters to these individual patients until the receivables had been outstanding for months and were virtually uncollectible, according to CW1 and CW2 (¶¶37-38, 46);

(iv) that the DSO for fiscal 3Q 2008 was 75; a metric that was abnormally high compared to median industry DSO of 40;

(v) that the detailed aging reports described by CW1 in ¶41 informed defendants of the age of BHL's receivables and the associated payor; and

(vi) that the allowance for doubtful accounts as a percentage of net receivables, a common metric for assessing collectibility and the quality of

receivables, was 23.2%; a metric that was far in excess of the 10% or less reported by Celera's publicly traded "peer companies."

102.     Indeed, the Registration Statement itself confirms defendants' knowledge of the falsely reported financial results for the nine months ending 3Q 2008 by reiterating defendants' "close monitoring of billings and [Celera's] collection experience." Monitoring that would have informed defendants of the red flags described in ¶101 above.

103.     By failing to increase Celera's allowance for doubtful accounts or write-off the impaired A/R, defendants inflated Celera's reported net income and earnings and net A/R and understated Celera's expenses for the nine months ending 3Q 2008, rendering the Registration Statement materially false and misleading when issued.

104.     Additionally, Celera's Registration Statement created the false impression that defendants were following Celera's stated process for reserving receivables and that reasonable collection efforts of the receivables were even being made, when they were not according to CW1 and CW2 with respect to Blue Cross/Blue Shield patients, as described in ¶¶37-38, 46.

105.     Further, the Registration Statement falsely represented that A/R are "reported at realizable value, net of allowances for doubtful accounts, which is estimated in the period of the related revenue." In addition to defendants failing to take adequate allowances for doubtful accounts as described in ¶101 above, defendants' A/R was inaccurately reported because it included receivables for tests that insurance carriers, such as UnitedHealth, that had already conveyed to Celera that they considered experimental and would not reimburse for as described in ¶40. Manual adjustments writing off these experimental tests would not occur in the period in which defendants recognized revenue as it would take up to six months due to the inadequate internal controls at Celera for these adjustments to be made.

106.     Defendants also indicated that while most third-party payors "currently have approved our clinical laboratory tests," the denial of tests for reimbursement from third-party payors could have an adverse financial impact. These statements were false and misleading because, for example: (i) as CW4 explained, Celera's new genetic tests, which were part and parcel to Celera's business model were considered experimental and thus non-reimbursable by most insurance

companies (¶61); and (ii) UnitedHealth had already communicated that it considered certain tests to be experimental and deny reimbursement but, as explained by CW2 (¶40), defendants continued to record revenue for these tests and failed to write-off the amounts recorded in the period in which the revenue was recorded.  As such, the denial of reimbursements was already impacting Celera's financial condition.

**Defendants Falsely Reported Inflated Earnings and Understated Expenses for Fiscal 4Q 2008 and FY 2008, and Mislead Investors About Celera's Business**

107.   On July 23, 2008, the Company issued a press release entitled "Celera Corporation Reports Fourth Quarter and Fiscal 2008 Results," which stated in part:

> **For the fourth quarter of fiscal 2008, Celera reported a net loss of $96.8 million, or $1.21 per share**, compared to a net loss of $8.0 million, or $0.10 per share, for the prior year quarter. . . .  Fourth quarter fiscal 2008 loss per share on a non-GAAP basis, excluding the items listed in the reconciliation table below, **was $0.01**, compared to a loss of $0.07 per share for the prior year quarter.  All per share amounts are pro forma based on Applera Corporation-Celera Group Common Stock.

> \*     \*     \*

> **For fiscal 2008, Celera reported a net loss of $103.2 million, or $1.30 per share**, compared to a net loss of $20.6 million, or $0.26 per share, for fiscal 2007. For fiscal 2008 and 2007, Celera recorded items that affected the comparability of results and a breakdown of these items is listed in the reconciliation table below.  For fiscal 2008, these items increased the net loss by $104.1 million, which included the $91.2 million non-cash tax charge.  For fiscal 2007, items affecting comparability increased the net loss by $2.1 million.  Fiscal 2008 earnings per share (EPS) on a non-GAAP basis, excluding the non-cash tax charge and other items described in the reconciliation table below, **were $0.01**, compared to a loss of $0.24 per share for the prior year.

> "The quarter's operating performance was good, closing out a solid fiscal 2008 – a pivotal year for Celera," said Kathy Ordoñez, Chief Executive Officer of Celera.  **"The business developed as planned, as we achieved our annual financial goals for revenue and profitability on a non-GAAP basis**. . . .

> "We're pleased with the contributions to revenue from both our Berkeley HeartLab Service business and our Products business during the quarter," Ms. Ordoñez added.

108.   On July 23, 2008, defendants Ordoñez, Jung and Hall participated in a conference call reiterating Celera's 4Q 2008 and FY 2008 financial results as follows:

> **Joel Jung – Celera – VP Finance, CFO**

> \*     \*     \*

***In the fourth quarter of fiscal 2008, Celera reported a net loss of $96.8 million or $1.21 per share***, compared to a net loss of $8 million or $0.10 per share for the prior-year quarter.  Excluding special items, the fourth-quarter fiscal 2008 loss per share on a non-GAAP basis was $0.01, compared to a loss of $0.07 per share for the prior-year quarter. . . .

\*         \*         \*

***For fiscal year 2008, Celera reported a net loss of $103.2 million, or $1.30 per share***, compared to a net loss of $20.6 million or $0.26 per share for fiscal 2007.

Fiscal 2008 earnings per share on a non-GAAP basis were $0.01, excluding the non-cash charge and other specified items described in the reconciliation table in today's release.  This compares to a loss of $0.24 per share for the prior year.

109.    Defendants also continued to assure investors on the July 23, 2008 conference call that the "weak economy" would not affect Celera's lab service division:

**Bruce Cranna** – *Leerink Swann – Analyst*

Yes.  Have you seen any signs of a weak economy in that respect, or a change in consumer spending, if you will?

**Chris Hall** – *Celera – VP Clinical Operations at Berkeley HeartLab*

Yes, a couple of things – ***we talked about this on the last call***.  You know, we think that, in general, ***because of the focus on secondary prevention*** patients, ***that these folks tend to be sicker and tend to be more motivated, so they tend to – we don't think that we will see as much seasonality with this, or excuse me, much economic effect of this***.

The second piece of it is ***that the out-of-pocket is very little or nothing for most patients, so we don't expect to get hit dramatically from that angle***.  Third is I think if you look at the growth we've seen this quarter, where we haven't seen that happen to this day.

110.    On September 8, 2008, Celera filed with the SEC its fiscal year-end 2008 Form 10-K (year ending June 30, 2008).  The Form 10-K was signed by defendants Ordoñez and Jung.  It disclosed financial results for 4Q 2008 and FY 2008 that were slightly worse than the false and misleading financial results announced in Celera's July 23, 2008 press release.  Celera's Form 10-K ***reported year end net loss of $104 million, or $1.31 per share, SG&A expenses of $74.7 million, net accounts receivable of $39.5 million and a $8.5 million allowance for doubtful accounts***.  The Form 10-K also included the following false and misleading statements:

***Adjustments to the estimated receipts, based on final settlement with the third-party payors***, including Medicare, ***are recorded in revenue on settlement***.

\*         \*         \*

*The process for determining the appropriate level of allowance for doubtful accounts involves judgment, and considers the age of the underlying receivables, type of payor, historical and projected collection experience, and other external factors that could affect the collectibility of the receivables*, *The process includes the close monitoring of billings and collection experience, which helps reduce the risks of material revisions to allowance estimates.  An account is written-off against the allowance for doubtful accounts when all reasonable collection efforts have been unsuccessful or the account has been transferred to a third party collection agency*.

111.    On September 9, 2008, defendants Ordoñez, Jung and Hall participated in an analyst day, during which defendant Hall reported to analysts and the public on Celera's reimbursement of its lab services division, BHL:

The one subtle point on here, just to be clear, is that we are targeting secondary prevention patients.  We define that as people with known heart disease of which there is conservatively about 20 million.  Arguably, the number of people that could have the Berkeley done that have some lipid problem, some metabolic issue is probably 60 million to 70 million but when we talk that reimbursement is getting done and that we're receiving money for tests like KIF6 remember that's always in the context of secondary prevention.

That could be very different for some [of] you or other people that don't actually know that they have a disease.  We've not done the mass screening market.  That's not what we do at Berkeley.  *This gives you a snapshot of our reimbursement*.  The big ah-ha here is that – not that it's probably that surprising, is that we end up with less money for Medicare than we do in terms of percentage samples. *About 47% of our samples are patients who have Medicare as their main payer, but they only equate for about 38% of our revenue.  We end up getting more money from commercial insurance carriers*.

We end up with a better reimbursement from commercial carriers but it takes a significantly longer time than Medicare.  Medicare, we end up getting paid relatively fast, quickly, and easily.  That said, we'll become under increasing pressure over time to get a network.  As we get a network collections will get better, the process will get easier and patients will have a lower out-of-pocket that should fuel further growth but at a lower revenue base.  We currently have agreements with United Healthcare and Aetna in California and again those are speedy in payment but ends up with a discounted revenue per test.

112.    As part of the September 9, 2008 analyst day, defendants included a written presentation, referenced by defendant Hall in ¶111 above, that included *materials entitled "Reimbursement Payor Mix"* (attached hereto as Exhibit A), *in which BHL's 2008 revenue included 38% Medicare and 61% commercial* and wherein defendants indicated that Medicare generally pays Celera within 20 days and that "*Commercial reimbursement takes a significantly longer time than Medicare but generally reimburses at a higher rate*."

113.     Defendant Jung during the September 9, 2008 analyst day also described Celera's revenue recognition policy as follows:

> *Within the Lab Services business, testing services are recorded when we report results out to physicians.  I think Chris had mentioned earlier, some of that is through Medicare.  Some of that is under what we'll call [PP allotted] network, and some of that is today under contracts with a couple of the large insurance companies.*

**Reasons Why Defendants' Fiscal 4Q 2008 and FY 2008 Statements Were Materially False and Misleading**

114.     Celera's fiscal 4Q 2008 and FY 2008 (ending June 30, 2008) reported income, earnings and expenses and net A/R violated basic accounting standards and were false and misleading.  Celera failed to adequately maintain its A/R reserves as required by SFAS No. 5 which requires that an estimated loss from a loss contingency be accrued by a charge to income if: (a) information available prior to issuance of the financial statements indicates that it is probable than an asset had been impaired (here, BHL's A/R); and (b) the amount of the loss can be reasonably estimated.  *See* SFAS No. 5, ¶8.  Even if one or both of these conditions are not met (which they were), defendants were still required to disclose the loss contingency where there is at least a "reasonable possibility" that a loss or an additional loss may have been incurred.  *See* SFAS No. 5, ¶10.

115.     As described in detail in ¶¶63-82, defendants knew that it was probable that Celera's A/R was impaired and that as a result the allowance for doubtful accounts recorded as of 4Q 2008 was materially inadequate in violation of SFAS No. 5 and GAAP, for the following reasons:

> (i)     approximately half of the Celera's lab service revenue was from out-of-network providers who were not contracted to pay a set amount for the services, increasing the risk that the third-party payor may deny the claim or pay less than the billed amount;

> (ii)    that as described by CW1 and CW2 in ¶¶37-38, 46 and later admitted by defendants as described in ¶¶10, 21, Blue Cross/Blue Shield representing approximately 20% of the sample volume of BHL's lab services was remitting payment to individual patients, not Celera, thereby impacting Celera's collection activities and exposing Celera "to additional bad-debt risk";

> (iii)   that despite knowledge in April 2008 of a significant and noticeable trend in unpaid receivables owed by Blue Cross/Blue Shield and knowledge that Blue Cross/Blue Shield had been sending payment to individual patients for BHL test services since early 2008, Celera did not even send collection letters to these

individual patients until the receivables had been outstanding for months and were virtually uncollectible according to CW1 and CW2 (¶¶37-38, 46);

(iv) that the DSO for fiscal 4Q 2008 was 84; a metric that was abnormally high compared to median industry DSO of 40 days;

(v) that the detailed aging reports described by CW1 in ¶41 informed defendants of the age of BHL's receivables and the associated payor; and

(vi) that allowance for doubtful accounts as a percentage of net receivables, a common metric for assessing collectibility and the quality of receivables, was 21.5%, alarmingly higher than the 10% or less reported by Celera's publicly traded "peer companies."

116. Celera's FY 2008 Form 10-K confirms defendants' knowledge of the falsely reported 4Q 2008 and FY 2008 financial results by reiterating defendants' "close monitoring of billings and [Celera's] collection experience." Monitoring that would have informed defendants of the red flags described in ¶115 above.

117. By failing to increase Celera's allowance for doubtful accounts or write-off the impaired A/R, defendants inflated Celera's reported net income, earnings and net A/R and understated Celera's expenses for 4Q 2008 and FY 2008. The magnitude of the understatement for Celera's allowance for doubtful accounts is evidenced by Celera's increase of the allowance a year later to more than $39 million, more than five times the amount reported for FY 2008 (ending June 30, 2008).

118. Defendants' false characterization of Celera's adjustments to receipts and process for recording an allowance for doubtful accounts are confirmed by the accounts of witnesses. For example, the manual adjustments based on UnitedHealth's denied tests would not "be recorded in revenue on settlement" as it would take up to six months due to the inadequate internal controls at Celera for these adjustments to be made according to CW1, ¶40. UnitedHealth was only one of two reported insurance carriers that Celera had contracted with as of this time and thus defendants would have knowledge of the terms of that contract as it was a focus of Celera and the Individual Defendants.

119. Further, as detailed by CW1 in ¶37, the Blue Cross patients' receivables were aging to upwards of six months, or 180 days, since that insurance carrier had ceased remitting payment directly to Celera in early 2008. Receivables which "reasonable collection efforts" were not being

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                                                                          - 38 -

1   made, as collection letters were not sent out until months later according to CW1 and CW2 (¶¶37-38,

2   46).  Facts defendants would have known based on their admitted "close monitoring of billings and

3   [Celera's] collection experience" as well as the aging reports described by CW2 (¶41) and the

4   forecast/budgets described by CW3 (¶¶49, 52).  Thus, defendants' statements regarding the process

5   for determining the appropriate level of doubtful accounts were materially misleading.

6          120.    Additionally, it was misleading for defendants to tell the investing public that

7   individual patients were paying "very little" or "nothing" insulating Celera from a weak economy.

8   ¶109.  Reports of CW4 (¶¶59, 61), a top-performing sales representative contributing substantially to

9   BHL's revenue, indicated that patients would be billed $109-$159 under the clear price program (as

10  opposed to Medicare or the no balance billing program described by CW2 in ¶44).

11         121.    Further, CW1 and CW2 confirm that the onus was on Celera to collect from

12  individual Blue Cross/Blue Shield patients, which defendants later represented approximately 20%

13  of BHL's sample volume.  Indeed, when defendants announced that Celera was writing down $20.1

14  million for doubtful accounts for the three months ending June 27, 2009, the balances were

15  "primarily due from patients" extending back over 360 days, or to approximately July 2, 2008.

16  Thus, at the time of defendants' statements, in July and September 2008, Celera had millions worth of

17  receivables owed by individual patients.

18         122.    Defendants' statements regarding Celera's reimbursement payor mix were likewise

19  false and misleading because the snapshot that defendants provided – Medicare and commercial

20  insurance carriers – omitted the large amount of receivables owed by individual patients and thus,

21  the risk of defendants' reliance on individual payors to contribute to Celera's bottom-line.

**Defendants Falsely Reported Inflated Calendar 3Q 2008 Earnings, Understated Expenses and Continued to Mislead Investors About Celera's Business**

23         123.    On October 28, 2008, the Company issued a press release entitled "Celera

24  Corporation Reports Third Quarter Calendar 2008 Results," which stated in part:

25         ***For the third quarter of calendar 2008, Celera reported a net loss of $7.0
26         million, or $0.09 per share***, compared to net income of $0.7 million, or $0.01 per
           share, for the prior year quarter.  Celera recorded items in the third quarter of
27         calendar 2008 that affected the comparability of results.  A breakdown of these items
           is listed in the reconciliation table below.  These items increased the net loss for the
28         quarter by $7.5 million.  ***Net income on a non-GAAP basis***, excluding the items

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                                      - 39 -

listed in the reconciliation table below, *was $0.01 per share for the third quarter of calendar 2008 and for the prior year quarter*.

"*We're pleased with the growth of both our Lab Services* and our Products business segments *during the quarter*," said Kathy Ordoñez, Chief Executive Officer of Celera.

124.   The October 28, 2008 press release also reported the following SG&A expenses:

*SG&A expenses for the third quarter of calendar 2008 increased to $25.2 million* from $8.1 million in the prior year quarter, primarily due to the inclusion of BHL expenses.

125.   On the same day, October 28, 2008, defendants Ordoñez, Jung and Hall participated in an earnings conference call for calendar 3Q 2008 wherein defendants made the following statements regarding Celera's financial condition:

**Kathy Ordonez –** *Celera – CEO*

Thank you, David, and good afternoon, everyone. *We were pleased with the overall performance this last quarter, with strong contributions both financially and strategically from our lab services* and product segments, while sales in our alliance with Abbott also increased. . . .

. . . *In the recent quarter, we also incurred higher SG&A expenses than planned at BHL, in part due to bad debt expense* and commissions associated with higher than expected revenue. Separately, transition work related to our recent separation from Applied Biosystems, formerly Applera, increased SG&A costs during the quarter compared to the prior year quarter.

\*       \*       \*

**Joel Jung –** *Celera – CFO*

*For the third quarter of calendar 2008 Celera reported a net loss of $7 million or $0.09 per share* compared to net income of $700,000 or $0.01 per share in the prior year quarter.  Results for the third quarter of calendar 2008 were affected by several items that increased the net loss by $7.5 million as described in the reconciliation table in today's release and which is available on our website.  These included the ongoing amortization of intangible assets from the acquisition of BHL and Atria, asset writedowns on debt securities in our investment portfolio resulting from the turmoil in the financial markets, and certain employee related charges associated with the ongoing integration of BHL and transition activities related to our recent separation from Applied Biosystems.

Excluding these items third quarter calendar 2008 earnings per share on a non-GAAP basis was $0.01, the same as the prior year quarter*. SG&A expenses in the quarter increased to $25.2 million from $8.1 million in the prior year quarter, due primarily to the inclusion of expenses at BHL* which was acquired in the fourth quarter of calendar 2007.

126.    Defendants also denied any real adverse impact on the lab services as a result of the economic downturn as follows:

**Derik De Bruin – *UBS – Analyst***

Okay. I guess I'm getting for service providers like Berkeley I've had a couple questions from investors asking about potential economic sensitivity, would people cut back on visits, could you just talk about what you're seeing in terms of any slowdown in volumes? Obviously it doesn't look like it from the numbers but if you could talk about what you think about the economic impact?

**Chris Hall - *Celera – Chief Business Officer, Berkeley HeartLab***

***Sure, for the most part we haven't really seen any adverse impact on the lab services at BHL*** and other economic downturns honestly, Derik, and we believe there's a couple reasons for that.  The first is that we're dealing with secondary prevention patients and those people tend to be sicker and their doctors tend to push them into the program, and they tend to be more motivated.  Secondarily, ***most of these patients are paying very little out of pocket, both because of Medicare covering most of the tests or covering the tests for patients that are secondary prevention patients and us increasingly getting into the network and PPO patients paying on their $100, we think that the amount that the patient is paying is actually reasonable***.  That said, what we're seeing in the broad economy is unprecedented and it could impact the traditional model and the dynamics on a go forward basis but so far what we've seen is where we are and reflected in this quarter.

127.    On this news, Celera's stock rose over the following days from a close of $9.21 on October 27, 2008 to $10.05 on October 29, 2008.

128.    On November 12, 2008, Celera filed with the SEC its calendar 3Q 2008 Form 10-Q. The Form 10-Q was signed by defendants Ordoñez and Jung.  ***Celera's 3Q 2008 Form 10-Q false and misleadingly stated a net loss of $7 million, or $0.09 per share, SG&A expenses of $25.2 million, net accounts receivable of $44.6 million and a $11.6 million allowance for doubtful accounts.***

129.    Celera's calendar 3Q 2008 Form 10-Q also contained the following false and misleading statement:

***Our revenues are highly dependent on our clinical laboratory tests and diagnostic products being approved for reimbursement*** by Medicare and other government healthcare programs, as well as private insurance companies and managed care organizations, commonly referred to, collectively, as "third-party payors." ***Although most third-party payors currently have approved our clinical laboratory tests and the use of our diagnostic products for reimbursement, this could change if they determine that these tests and products are not medically necessary or otherwise not approved for reimbursement*** under standards independently established by these third-party payors which may take into consideration factors such as the experimental nature of a particular test or product,

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                                                                                    - 41 -

or whether less expensive alternatives are available. Each third-party payor makes its own decision as to whether a given diagnostic test is medically necessary and worthy of payment. If Medicare or any other significant third-party payor determines that our clinical laboratory tests are not medically necessary or are not otherwise suitable for reimbursement, healthcare providers could be reluctant to prescribe these tests. Similarly, if the use of our diagnostic products is not approved for reimbursement, purchasers of these products could decrease or eliminate their orders of these products. ***This could harm our operating results and financial condition.*** Also, there can be no assurance that third-party payors will approve for reimbursement any clinical laboratory tests or the use of diagnostic products sold by us in the future.

**Reasons Why Defendants' Calendar 3Q 2008 Statements Were Materially False and Misleading**

130.    Celera's calendar 3Q 2008 reported income, earnings net A/R and expenses violated basic accounting standards and were false and misleading. Celera failed to adequately maintain its A/R reserves as required by SFAS No. 5 which requires that an estimated loss from a loss contingency be accrued by a charge to income if: (a) information available prior to issuance of the financial statements indicates that it is probable than an asset had been impaired (here, BHL's A/R); and (b) the amount of the loss can be reasonably estimated. *See* SFAS No. 5, ¶8. Even if one or both of these conditions are not met (which they were), defendants were still required to disclose the loss contingency where there is at least a "reasonable possibility" that a loss or an additional loss may have been incurred. *See* SFAS No. 5, ¶10. As a result, the Company's financial results were falsely represented.

131.    As described in detail in ¶¶63-82, defendants knew that it was probable that Celera's A/R was impaired and that as a result the allowance for doubtful accounts recorded as of calendar 3Q 2008 was materially inadequate in violation of SFAS No. 5 and GAAP, based on the following:

(i) approximately half of the Celera's lab service revenue was from out-of-network providers who were not contracted to pay a set amount for the services, increasing the risk that the third-party payor may deny the claim or pay less than the billed amount;

(ii) that as described by CW2 in ¶¶37-38, 46 and later admitted by defendants as described in ¶¶10, 21, Blue Cross/Blue Shield representing approximately 20% of the sample volume of BHL's lab services was remitting payment to individual patients, not Celera, thereby impacting Celera's collection activities and exposing Celera "to additional bad-debt risk";

(iii) that despite knowledge in April 2008 of a significant and noticeable trend in unpaid receivables owed by Blue Cross/Blue Shield and knowledge that Blue Cross/Blue Shield had been sending payment to individual patients for BHL test

services since early 2008, Celera did not even send collection letters to these individual patients until the receivables had been outstanding for months and were virtually uncollectible, according to CW1 and CW2 (¶¶37-38, 46);

(iv) that the DSO for calendar 3Q 2008 was 89, an increase of 21 from the DSO of 68 for the quarter ending nine months earlier (December 31, 2007). Further, a DSO of 89 was more than double the median industry DSO of 40 days and as such, indicative of impairment of A/R;

(v) that the detailed aging reports described by CW1 in ¶41 informed defendants of the age of BHL's receivables and the associated payor;

(vi) that the budgets and forecasts, including information regarding BHL's A/R, alerted the Individual Defendants to the insufficiency of Celera's allowance for doubtful accounts (¶¶49-52);

(vii) that allowance for doubtful accounts as a percentage of net receivables, a common metric for assessing collectibility and the quality of receivables, was 26%, more than double the 10% or less reported by Celera's publicly traded "peer companies."

132.     Additionally, while defendants partially revealed that Celera "incurred higher SG&A expenses than planned at BHL, in part due to bad debt expense," this statement was misleading because defendants concealed that the SG&A expenses Celera did record were woefully inadequate in the face of unlikely probability that defendants could collect on the outstanding receivables owed, including the approximately $20 million defendants eventually announced would be written down in 2Q 2009 largely from individual patients. Based on defendants' own subsequent admissions, these receivables as of September 27, 2008 (calendar-end 3Q 2008) would have been close to or in excess of 90 days outstanding. The increasing DSO (89) coupled with defendants' knowledge that to settle these accounts they would have to collect aged receivables from individual BlueCross/Blue Shield patients, rendered there statements materially misleading.

133.     Further, for the third quarter in a row, defendants continued their scheme to mislead investors regarding BHL's business by denying "any adverse impact on the lab services at BHL" due to the economy or "slowdown in volumes" and claiming that individual patients were paying "very little out of pocket." In contrast to defendants' public statements, CW4, who was responsible for generating significant top-line revenue for BHL, explained that from mid-2008 onward internal volume reports reflected a week-over-week loss of physician accounts. ¶62. Additional witness and defendants' own belated admissions confirm that millions in receivables were owed by individual

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                                           - 43 -

1   patients, rendering defendants' statements regarding the nature of Celera's lab services business

2   false.

3         134.    Celera's calendar 3Q 2008 Form 10-Q confirms defendants' knowledge of the falsity

4   of defendants' statements by reiterating defendants' "close monitoring of billings and [Celera's]

5   collection experience." Monitoring that would have informed defendants of the red flags described

6   in ¶131 above as well as the necessity to collect substantial sums from individual payments and the

7   drop-off in sales volume.

8         135.    Defendants also indicated that while most third-party payors "currently have

9   approved our clinical laboratory tests," the denial of tests for reimbursement from third-party payors

10   could have an adverse financial impact. These statements were false and misleading because, for

11   example: (i) as CW4 explained, Celera's new genetic tests, which were part and parcel to Celera's

12   business model were considered experimental and thus non-reimbursable by most insurance

13   companies (¶61); and (ii) UnitedHealth had already communicated that it considered certain tests to

14   be experimental and deny reimbursement but, as explained by CW2 (¶40), defendants continued to

15   record revenue for these tests and failed to write-off the amounts recorded in the period in which the

16   revenue was recorded. As such, the denial of reimbursements was already impacting Celera's

17   financial condition.

18   **Defendants Falsely Reported Inflated 4Q 2008 Calendar and 2008 Year End Transition Earnings, Misled Investors About Celera's Business and Falsely Provided 2009 Guidance**

19

20         136.    On February 17, 2009, the Company issued a press release entitled "Celera

21   Corporation Reports Fourth Quarter Calendar 2008 Results," which stated in part:

22         For the fourth quarter of calendar 2008, ***Celera reported a net loss of $6.1 million, or $0.08 per share***, compared to net income of $0.3 million, or $0.00 per share, for the

23   prior year quarter. Results for both periods included items that affected the comparability of results. A breakdown of these items is listed in the reconciliation

24   table below. These items increased the net loss for the fourth quarter of calendar 2008 by $8.2 million. ***Net income on a non-GAAP basis***, excluding the items listed

25   in the reconciliation table below, ***was $2.1 million, or $0.03 per share***, for the fourth quarter of calendar 2008 compared to $1.7 million, or $0.02 per share, for the prior

26   year quarter [and for Celera's six-month transition].

27                   *       *       *

28         ***For the transition period, Celera reported a net loss of $13.1 million, or $0.16 per share***, compared to net income of $1.0 million, or $0.01 per share, for the

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)          - 44 -

comparable period in the prior year.  Results for both periods included items that affected the comparability of results.  A breakdown of these items is listed in the reconciliation table below.  These items increased the net loss for the transition period by $15.7 million.  Net income on a non-GAAP basis, excluding the items listed in the reconciliation table below, was $2.6 million, or $0.03 per share, for the transition period, compared to $2.4 million, or $0.03 per share, for the prior year period.

*        *        *

*SG&A expenses for the fourth quarter of calendar 2008 were $27.0 million compared to $20.1 million in the prior year quarter; $3.7 million of this increase was due to an increased allowance for bad debt at BHL.*  Additional contributions to this increase in SG&A were from Corporate infrastructure build-out and transition activities related to Celera's separation from Applera Corporation (now Life Technologies, Inc.), and costs associated with the expansion of sales efforts at BHL.

137.   The February 17, 2009 press release also provided the following guidance:

**Outlook for 2009**

Celera anticipates that its 2009 financial performance could be affected by various factors, including uncertainty in the global economy and its potential impact on the healthcare system.  Subject to the inherent risks and uncertainties that may affect Celera's financial performance, which are detailed in the Forward-Looking Statements section of this release, Celera expects the following for fiscal year 2009:

1   *Total revenues are anticipated to be $192 - $202 million* and gross margin, as a percentage of revenue, is anticipated to be 66 - 70 percent.  *The number of samples tested at BHL in 2009 is expected to grow by more than 20 percent over 2008 levels.*

*This revenue guidance reflects BHL's expectation that an increasing portion of its business will be under contract with third-party insurance payors. Celera believes that moving under contract with third-party payors should allow BHL to increase its test volumes and operate more efficiently with respect to billing and collections.  However, such contracts generally provide for reduced pricing for BHL's tests as compared to tests paid by non-contract payors.  Revenues from contract payors are based on the contract rate and, in the case of Medicare, the published fee schedules.  Revenues from non-contract payors are recorded net of allowances for differences between amounts billed and estimated receipts based on historical activity*.

2   *SG&A expenses are anticipated to be $102 - $112 million* and R&D expenses are anticipated to be $30 - $36 million.

*        *        *

4   *Celera anticipates mid-single digit EPS on a non-GAAP basis for 2009*, and expects to be slightly below breakeven on a non-GAAP basis in the first quarter. Due to declining interest rates, interest income is expected to be lower than the prior year.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                                                            - 45 -

138.     After issuing its fourth quarter and its transition period financial results, Celera hosted a conference call for analysts, media representatives and investors on February 17, 2009, during which defendants Ordoñez, Jung and Hall participated and represented the following:

**Kathy Ordonez – *Celera – CEO***

*          *          *

During the recent quarter, ***Celera's SG&A expenses increased 34% over the prior year period***.  While some of this expense growth was due to the corporate infrastructure buildout as a result of our split-off from Applera and the expansion of our sales efforts at BHL, ***the single major driver was an increased allowance for bad debt at BHL.  Currently approximately half of BHL's revenues are derived from testing reimbursed by Medicare, as well as private payers under contract.  We historically have received timely payments from these payers, making this portion of our business fairly predictable from a collections perspective***.

***For the remaining half of BHL's revenues, we have exposure to changing an inconsistent payment pattern from non-contracted payers and patients.  We have experienced an increase in Celera's DSO as a consequence of an increased aging of the BHL non-contracted payer and patient receivables***.

***During the fourth quarter of 2008, our allowance for bad debt increased $3.7 million over the prior year period***.  This increase included a discrete charge of approximately $1 million associated with a billing dispute with a contracted payer.  We now have a concerted program to improve collections at BHL.  We have increased our internal efforts and have retained an experienced third-party vendor to assist us.

We also have a goal during 2009 to increase the percentage of testing under contract at BHL.  While we expect new contracts to result in price reductions and impact our revenue growth rate on a short-term basis, we believe this is the best path forward as BHL continues to grow as it is expected to improve both the predictability of the business, as well as collections over the medium to long-term.

139.     During the February 17, 2009 conference call, defendants also issued guidance as follows:

**Joel Jung – *Celera – CFO***

*          *          *

***Total revenues are anticipated to be between $192 million and $202 million***, and gross margin as a percent of revenues is anticipated to be between 66% and 70%.  The number of samples tested at BHL in 2009 is expected to grow by more than 20% over 2008 levels.  ***This revenue guidance reflects our expectation that an increasing portion of BHL's business will be under contract with third-party insurance payers***.  Celera believes that moving under contract with third-party payers should allow BHL to increase its test volumes and operate more efficiently with respect to billing and collections.  However, ***such contracts generally provide for reduced pricing for BHL's tests as compared to tests paid by non-contract payers***.  Revenues from contract payers are based on the contract rates and in the

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                                                                - 46 -

case of Medicare the published fee schedules. Revenues from non-contract payers are recorded net of allowances for differences between amounts billed and estimated receipts based on historical activity. ***SG&A expenses are anticipated to be between $102 million and $112 million***, and research and development expenses are anticipated to be between $30 million and $36 million. Celera expects to take a pretax restructuring charge of approximately $1.8 million over the first three quarters of fiscal 2009 associated with the closure of its Rockville, Maryland facility. Approximately $1.4 million of these charges are expected to be cash outlays.

140.    Defendants also responded to analyst questions on the February 17, 2009 conference call regarding Celera's efforts for additional contracts with private payors and bad debt:

**Sarah Michelmore – *Cowen & Co. – Analyst***

Kathy, can you just tell us what has prompted the review of the BHL contracting? Is there something specific that has gone on that has prompted you to move in that direction? This seems like a rather new development.

**Kathy Ordonez – *Celera – CEO***

Well, as I indicated previously, currently about 50% of the business is either under contract or involves payment for Medicare. And, as I also indicated, ***we have seen an increase in the allowance that we have been making for bad debt at BHL as a result of certain activities by some of the private payers***, and we think that as we look at the size and maturity of this business, that the right strategy for us going forward is to bring more of the business under contract. We think it makes the collections more predictable and also is more consistent with the evolution of the size of the business.

*       *       *

**Peter Lawson – *Thomas Weisel Partners – Analyst***

I just wonder if I could talk about that bad debt. Is that likely to continue in 2009? If you can extend that or further expectation?

**Kathy Ordonez – *Celera – CEO***

Well, as we indicated, ***about half of our business is either with Medicare or under contract, and for the private payer business that is not contracted or where patient copays, etc. are involved, there is always a certain amount of uncertainty about the collections with that. And so we have a very strong, as I said, concerted effort here at Celera to focus on the receivables and to improve our ability to collect those receivables***, but no one can predict what will happen. These are somewhat unprecedented economic times, and while I indicated our very strong plan to move more of the private payer business under contract, that has not yet occurred, and it is something that we expect to do but not have not yet achieved. So I don't know if you have additional comments or color you want to add to that, but that –

**Joel Jung – *Celera – CFO***

I think that really is the focus of things here clearly. The contracts will go a long ways towards helping to resolve some of those issues.

**Kathy Ordonez** – *Celera* – *CEO*

> Also, as we indicated in the script, there was a discrete issue that contributed to the allowance for bad debt in the quarter that we are reporting about here that contributed about $1 million, and we would not hopefully expect that to be a recurring item.

141. During the February 17, 2009 conference call, defendant Hall misled investors as to Celera's BHL division's source of reimbursements in direct response to an analyst question regarding patient pay as follows:

**David Clare** – *Piper Jaffray* – *Analyst*

> It is Dave Clare here for Bill Quirk. Say, I was just hoping for that one-half of the business that is currently non-contracted.  How much of that is patient pay?

**Chris Hall** – *Berkeley HeartLab* – *Chief Business Officer*

> ***Actually most of it is ultimately reimbursed by insurance.  There is a small portion, which is patients without any insurance.  But most of that has some form of insurance behind it.***

142. Analysts sought more detail on Celera's bad debt during the February 17, 2009 conference call but defendants were not forthcoming:

**Derek De Bruin** – *UBS* – *Analyst*

> Well, I certainly was not going to grow that line this year. So it was a question of how much – I mean how big is the hit going to be in that.  So I guess just can you just give us a little bit more color if you want a share of it on how much of your SG&A guidance is actually implied for the bad debt allowance?

**Kathy Ordonez** – *Celera* – *CEO*

> I don't think we have broken that out, have we, Joel?

**Joel Jung** – *Celera* – *CFO*

> No, we are not going to get into the level of granularity.

**Kathy Ordonez** – *Celera* – *CEO*

> But things that you should be aware of as we – is that we continue to have an aggressive plan to expand the Berkeley footprint. We have been successful in doing that by adding new sales reps in new territories.  ***We have been able to increase the number of samples and the revenue at BHL.***  So that is an important aspect of it, and ***we have a very strong effort focused on collecting receivables internally***.

143. The same day, analysts such as Thomas Weisel Partners reported on defendants' increased allowances for bad debt.

144.   Upon this news, Celera's stock dropped $2.47 per share to close at $6.87 per share on February 18, 2009 – a one-day decline of 26% on high volume.

145.   On March 25, 2009, Celera filed with the SEC its calendar year end 2008 Form 10-KT (*i.e.*, the transition period).  The Form 10-KT was signed by defendants Ordoñez and Jung. *Celera's Form 10-KT false and misleadingly stated a net loss of $6.1 million for the calendar fourth quarter, or $0.08 per share, net accounts receivable of $47.7 million and a $16.8 million allowance for doubtful accounts*.

146.   The Form 10-KT, filed on March 25, 2009, also included the following statements:

*A large portion of BHL's clinical laboratory testing business is currently reimbursed by non-governmental third-party payors on an out-of-network, non-participating basis.*

*    *    *

We have recently experienced an increased aging of our non-contractual payor and patient receivables. *At December 27, 2008, our allowance for doubtful accounts was $16.8 million* as compared to $8.5 million at June 30, 2008.  Though we have implemented programs aimed at improving our collections, there can be no assurance that these will be successful.  Any failure to improve our collections, or a further deterioration in our receivables, will harm our operating results and financial condition.

A significant portion of our accounts receivables is owed to us by individual patients.  In general, it is difficult to collect amounts owed to BHL by individuals and it is becoming increasingly more difficult to do so in the current economic environment. . . .

Missing or incorrect information on requisitions adds complexity to and slows the billing process, creates backlogs of unbilled requisitions, and generally increases the aging of accounts receivable and our allowance for doubtful accounts. *We believe that a portion of our allowance for doubtful accounts is attributable to the lack of, or inaccurate, billing information*. . . .

*    *    *

Our net revenues include patient test service revenues associated with BHL's operations.  We recognize this revenue on completion of the testing process and when the test results are sent to the ordering healthcare provider. . . . Revenues from contract and non-contract payors are recorded net of allowances for differences between amounts billed and estimated receipts based on historical activity. *Adjustments to estimated receipts, based on final settlement, are recorded in revenue on settlement*.

*    *    *

Receivables are reserved based on specific identification and on their respective aging categories.  *Our process for determining the appropriate level of the*

*allowance for doubtful accounts involves judgment, and considers the age of the underlying receivables, type of payor, historical and projected collection experience, current economic and business conditions, and other external factors that could affect the collectibility of our receivables.* The allowance for doubtful accounts is reviewed for adequacy, at a minimum, on a quarterly basis. *An account is written-off against the allowance for doubtful accounts when reasonable collection efforts have been unsuccessful and it is probable the receivable will not be recovered.*

147. Less than two weeks later, on April 6, 2009, defendant Jung resigned from the Company effective immediately. Defendant DeBlasi was appointed CFO.

**Reasons Why Defendants' 4Q 2008 Calendar and FY 2008 Transition Period Statements Were Materially False and Misleading**

148. Celera's calendar 4Q 2008 reported income, earnings, net A/R and expenses violated basic accounting standards and were false and misleading. Celera failed to adequately maintain its A/R reserves as required by SFAS No. 5 which requires that an estimated loss from a loss contingency be accrued by a charge to income if: (a) information available prior to issuance of the financial statements indicates that it is probable than an asset had been impaired (here, BHL's A/R); and (b) the amount of the loss can be reasonably estimated. *See* SFAS No. 5, ¶8. Even if one or both of these conditions are not met (which they were), defendants were still required to disclose the loss contingency where there is at least a "reasonable possibility" that a loss or an additional loss may have been incurred. *See* SFAS No. 5, ¶10.

149. As described in detail in ¶¶63-82, defendants knew that it was probable that BHL's A/R was impaired and that as a result the allowance for doubtful accounts recorded as of calendar 4Q 2008 was inadequate in violation of SFAS No. 5 and GAAP, based on the following:

(i) approximately half of the Celera's lab service revenue was from out-of-network providers who were not contracted to pay a set amount for the services, increasing the risk that the third-party payor may deny the claim or pay less than the billed amount;

(ii) that as described by CW1 and CW2 in ¶¶37-38, 46 and admitted by defendants as described in ¶¶10, 21, Blue Cross/Blue Shield representing approximately 20% of the sample volume of BHL's lab services was remitting payment to individual patients, not Celera, thereby impacting Celera's collection activities and exposing Celera "to additional bad-debt risk";

(iii) that despite knowledge in April 2008 of a significant and noticeable trend in unpaid receivables owed by Blue Cross/Blue Shield and knowledge that Blue Cross/Blue Shield had been sending payment to individual patients for BHL test services since early 2008, Celera did not even send collection letters to these

individual patients until the receivables had been outstanding for months and were virtually uncollectible, according to CW1 and CW2 (¶¶37-38, 46);

(iv) that the DSO for calendar 4Q 2008 was 92, a figure that was abnormally high compared to the median industry DSO of 40 days;

(v) that the detailed aging reports described by CW1 in ¶41 informed defendants of the age of BHL's receivables and the associated payor;

(vi) that the budgets and forecasts reviewed by the Individual Defendants alerted them to the insufficiency of Celera's allowance for doubtful accounts (¶¶49-52); and

(vii) that allowance for doubtful accounts as a percentage of net receivables, a common metric for assessing collectibility and the quality of receivables, was 35.2%, three times higher than the 10% or less reported by Celera's publicly traded "peer companies."

150.    While defendants partially disclosed that Celera had experienced an increase in Celera's DSO as a consequence of "an increased aging of the BHL non-contracted payer and patient receivables," driving a corresponding increased allowance for bad debt at BHL of $3.7 million over the prior period, defendants continued to fail to sufficiently accrue for Celera's impaired A/R, in accordance with SFAS No. 5 and other accounting standards or write-off Celera's doubtful accounts in accordance with its stated policy in its 2009 Form 10-K.

151.    Additionally, defendants continued to conceal material adverse facts, including that:

(i) the increased aging was primarily due to patient receivables, in contrast to defendants' prior statements that BHL's business model was principally secondary patients who paid "very little out of pocket" and statements that "most" of its business that was non-contracted was "ultimately reimbursed by insurance";

(ii) the "inconsistent payment patterns" of patients were in large part due to failure of Celera to send out collection letters to Blue Cross/Blue Shield patients until a year after this insurance carrier stopped remitting payment directly to Celera, creating a large probability that Celera would never collect on these outstanding receivables; not simply "inaccurate billing information" as defendants falsely told investors; and

(iii) the increased allowance for bad debt ($16.8 million) as a consequence of the increased aging of DSO at year-end 2008 (92 days ) cannot be reconciled with the fact that Celera's DSO was 89 three months earlier and no similar allowance was taken.

152.    Defendants belatedly admitted that Celera would charge-off and/or reserve more than $20 million in doubtful accounts that were 360 days outstanding as of June 27, 2009.  Thus, by calendar year-end 2008, Celera had approximately $20 million or more of receivables that were at

least 180 days outstanding.  Defendants, however, did not reserve for nor write this bad debt off at or before calendar year-end 2008 despite Celera's own stated accounting policy requiring a write-off because: (i) no reasonable collection efforts could be made on balances that were stagnant for six months plus; and (ii) it was more than probable that these receivables would not be recovered. Nevertheless, Celera's allowance for doubtful accounts was only ***$16.8 million*** as of December 27, 2008.

153.    Further, defendants' guidance of 2009 revenues of $192-$202 million (compared to 2008 calendar revenues of $175 million) and sample volume growth of more than 20% were also knowingly false when issued.  The guidance was undermined by facts known to defendants at that time, including:

(i) that Celera's sales numbers dropped significantly as a result of losing lab service clients and as a result of collection efforts by Celera beginning in January 2009 for prior services rendered to Blue Cross/Blue Shield patients as described by multiple witnesses (¶¶37-38, 43-48);

(ii) Celera's loss of additional lab services clients and a decline in business in early 2009 as a result of an unpopular move to start collecting for balances not paid by insurance companies from individual patients as described by CW1, CW2 and CW4 (¶¶37-38, 43-48, 61-62).    Accounts corroborated by defendants' later admission in August 2009 that Celera "aggressively went after trying to improve [its] collection process" including "trying to collect co-pays, deductibles and checks that may have been sent to patients from insurance carriers";

(iii) that the loss in clients was a particular problem because BHL's top referral sources (*i.e.*, healthcare providers) represented a significant percentage of its volume.  In 2007, BHL's top 150 referrals represented 56% of BHL's sample volume and 53% in 2008;

(iv) that Celera's addition of costs for new tests for individual patients in approximately October of 2008 was negatively received by patients and according to CW4, a top revenue producer, by the beginning of 2009 there was a noticeable negative response and attendant drop in business; and

(v) that Celera's discontinuation of its ancillary clinical services and support that had been provided to patients at the end of 2008 coupled with its change in billing policies resulted in Celera losing customers left and right; a loss that was reflected in volume reports from mid-2008 onward.

154.    Defendants provided this false revenue and growth guidance in order to mask the tens of millions of dollars of bad debt plaguing BHL's books.

155.    Celera relied on a recurring revenue stream of core tests ordered by physicians for secondary prevention patients.  This business model meant that when physicians ceased doing

1    business with Celera because of its collection efforts, defendants knew that they could no longer rely

2    on the three to four tests these secondary patients would have likely otherwise ordered each year.  As

3    such, defendants also knew that revenues and growth would decrease, not increase.  Indeed, a mere

4    four months later, defendants reduced 2009 revenue guidance by an astounding $32 million or 11%-

5    17% from $192-$202 million to $160-$179 million, largely because BHL's sample volume grew by

6    a mere 2%.  Defendants' explanation was that BHL "*lost accounts due to our efforts to collect*

7    *aging receivables*" in addition to broad economic conditions (which defendants repeatedly had

8    previously claimed they were insulated from).  Economic conditions, which defendant Hall would

9    explain on an August 6, 2009 conference call, related to Celera's efforts to collect from patients

10   which resulted in patients contacting their physicians and, in turn, reducing volume from the

11   physician.

12        156.    Likewise, defendants' guidance of SG&A expenses of $102-$112 million was

13   seriously undermined by facts known to defendants at the time of their guidance, principally the

14   necessity to increase Celera's allowance for doubtful accounts or write-off the existing bad debt as

15   result of the impairment of its lab services A/R due to the nature of the receivables (primarily

16   individuals) and Celera's failure to timely or reasonably seek payment for these corresponding

17   receivables.  Falsity and scienter of the SG&A guidance is highlighted by defendants' failure to

18   provide clarity in response to analysts' questions during the February 17, 2009 conference call

19   regarding how much of Celera's SG&A guidance was implied for its bad debt allowance, responding

20   that "we are not going to get into the level of granularity."

**Defendants Falsely Reported Inflated 1Q 2009 Earnings, Understated Expenses and Reiterated False 2009 Guidance**

22        157.    On May 6, 2009, the Company issued a press release entitled "Celera Corporation

23   Reports First Quarter 2009 Results," which stated in part:

25   > **For the first quarter of 2009, Celera reported a net loss of $1.4 million, or $0.02 per share**, compared to a net loss of $7.4 million, or $0.09 per share, for the prior year quarter.  Results for both periods included items that affected the comparability of results.  A breakdown of these items is listed in the reconciliation table below.  These items increased the net loss for the first quarter of 2009 by $2.0 million.  **Net income on a non-GAAP basis**, excluding the items listed in the reconciliation table below, **was $0.6 million, or $0.01 per share**, for the first quarter of 2009, compared to a net loss of $0.9 million, or $0.01 per share, for the prior year quarter.

1                                           \*       \*       \*

2     **Financial Highlights**

3                                           \*       \*       \*

- *SG&A expenses for the first quarter of 2009 were $25.3 million, or 55.4% of revenues*, compared to $21.3 million, or 53.9% of revenues, in the prior year quarter. *Of the increase in SG&A in the first quarter of 2009*, $1.7 million was primarily due to costs associated with the expansion of sales efforts, and *$2.3 million was due to increased allowance for doubtful accounts*. Excluding the allowance for doubtful accounts, SG&A expenses for the first quarter of 2009 were $20.2 million, or 44.2% of revenues, compared to $18.5 million, or 46.8% of revenues in the prior year quarter.

- *In the first quarter of 2009, allowance for doubtful accounts was $5.1 million, or 11.2% of revenues, and days sales outstanding were 98. This compares with allowance for doubtful accounts of $5.9 million, or 12.5% of revenues, and DSO of 92 in the fourth quarter of 2008*, which included a $1.0 million charge for a billing dispute with a contractual payor.

                                      \*       \*       \*

**Outlook for 2009**

    Celera anticipates that its 2009 financial performance could be affected by various factors, including uncertainty in the global economy and its potential impact on the healthcare system. Subject to the inherent risks and uncertainties that may affect Celera's financial performance, which are detailed in the Forward-Looking Statements section of this release, Celera expects the following for 2009:

- Total revenues are anticipated to be $192 - $202 million and gross margin, as a percentage of revenue, is anticipated to be 66 - 70%.

- *SG&A expenses are anticipated to be $102 - $112 million* and R&D expenses are anticipated to be $30 - $36 million.

                                      \*       \*       \*

- *Celera anticipates mid-single digit EPS on a non-GAAP basis for 2009*, and expects to be at, or slightly below, breakeven on a non-GAAP basis in the second quarter. Due to declining interest rates, interest income is expected to be lower than the prior year.

    158.     After issuing its 1Q 2009 financial results, Celera hosted a conference call for analysts, media representatives and investors on May 6, 2009, during which defendants Ordoñez, DeBlasi and Hall participated and represented the following:

    **Kathy Ordonez – *Celera – CEO***

                                        \*       \*       \*

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)           - 54 -

***Another of our highest priorities is to reduce our allowance for doubtful accounts and DSO by improving our collections and moving more of our current payers under contract.*** Ugo will provide more color on our collections efforts in a few minutes, but ***I would like to emphasize that this is a key focus for the Company as we have increased our internal efforts around improving collections***, retained an experienced third-party vendor to assist us, and hired key people with experience in healthcare reimbursement and collections.

In the first quarter of 2009, we entered into a preferred medical laboratory service agreement with Blue Cross and Blue Shield of Alabama for BHL's test services. The agreement establishes coverage across Blue Cross and Blue Shield's commercial health plans in the state of Alabama. With this new agreement, we estimate that approximately 55% of BHL's sample volume is now either derived from Medicare or from contracted private payer patients.

As we have indicated previously, while we expect new contracts to result in price reductions and impact our revenue growth rate on a short-term basis, we believe that this is the best path forward for us as it is expected to improve both the predictability of the business, as well as collections and profitability over the medium to long term.

159. During the same conference call, defendants falsely represented Celera's financial condition as follows:

**Ugo DeBlasi – Celera – CFO**

Thanks, Kathy. Revenues for the first quarter of 2009 were $45.7 million compared to $39.5 million for the first quarter of 2008. ***For the first quarter of 2009, Celera reported a net loss of $1.4 million or $0.02 per share compared to a net loss of $7.4 million or $0.09 per share in the prior year quarter***. Results for both periods included items that affected the comparability of results. A breakdown of these items is listed in the reconciliation table in today's release and posted on our website.

***These items increased the net loss for the first quarter of 2009 by $2.0 million***. Net income on a non-GAAP basis, excluding the items listed in the reconciliation table, was $0.6 million or $0.01 per share for the first quarter of 2009 compared to a net loss of $0.9 million or $0.01 per share for the prior year quarter.

***SG&A expenses for the first quarter of 2009 were $25.3 million or 55.4% of revenues*** compared to $21.3 million or 53.9% of revenues in the prior year quarter. The ***increase in SG&A was due to a $2.3 million increase in the allowance for doubtful accounts*** and a $1.7 million increase, primarily associated with the expansion of sales efforts. Excluding the allowance for doubtful accounts, SG&A expenses for the first quarter of 2009 were $20.2 million or 44.2% of revenues compared to $18.5 million or 46.8% of revenues in the prior year quarter. ***The allowance for doubtful accounts in the first quarter of 2009 was $5.1 million or 11.2% of revenues***, and days sales outstanding were 98. This compares with the fourth quarter of 2008 where the allowance for doubtful accounts was $5.9 million or 12.5% of revenues and DSO were 92. The fourth quarter of 2008 included a $1.0 million charge for a billing dispute with a contractual payer.

We have identified factors contributing to the increased DSO and are aggressively implementing measures to address these issues as we monitor their

effectiveness over the coming months.  The anticipated move to contract with additional out of network payers is expected to positively improve efficiencies in this area.  We also plan to replace or improve legacy systems and processes that support the billing and collections function.

160.   Defendant DeBlasi also provided the following false guidance:

Total revenues are anticipated to be $192 million to $202 million, and gross margin as a percent of revenue is anticipated to be 66% to 70%.  **SG&A expenses are anticipated to be $102 million to $112 million**, and R&D expenses are anticipated to be $30 million to $36 million.  **Celera anticipates mid-single digit EPS on a non-GAAP basis for 2009** and expects to be at or slightly below breakeven on a non-GAAP basis in the second quarter.  We believe this outlook could be affected by a number of factors and other risks and uncertainties outlined in today's release and in our filings with the SEC.

161.   On the May 6, 2009 conference call, analysts questioned defendants regarding the bad debt as follows:

**Peter Lawson – *Thomas Weisel Partners – Analyst***

I wonder if you could talk through what you have learned about the bad debt since last quarter and the plans that are in place to rectify it.

*              *              *

**Ugo DeBlasi – *Celera – CFO***

As I mentioned in my script, we have identified the factors contributing to the DSO, and we are aggressively implementing several measures to address these. ***Some key issues that we are addressing are late payments from Medicare, one private insurer's payment practices, discernible growth increase on the legacy billing and collection systems.***  We are looking at a variety of process improvement.  We are realigning our resources with the current payment practices that we are seeing.  There's additional documentation requests that have come from many of our payers.  ***So there's a host of issues and measures that we have in place to address them***, and we are going to continue to measure their effectiveness on our accounts.

**Peter Lawson – *Thomas Weisel Partners – Analyst***

Do you think you have seen the worst of the bad debt, or do you think there is more to come?

**Kathy Ordonez – *Celera – CEO***

***We know the reasons, and we are addressing those reasons*** with some of the measures that I have pointed out, and we are going to continue to see how effective they are on our accounts.

162.   Defendants also expounded on their guidance for 2009 as follows:

1    **Sara Michelmore – *Cowen & Co. – Analyst***

2           Okay.  And Kathy, I'm sorry if I missed it, but on the last call, ***you did talk***
     ***about the guidance in terms of Berkeley Heart volumes being up over 20% for the***
3    ***year***.  I'm just wondering in terms of the Berkeley Heart volume performance in the
     quarter and sort of what the trajectory is for the outlook if that is consistent with what
4    you guys had spoken about before?

5    **Kathy Ordonez – *Celera – CEO***

6           ***Well, as I commented earlier and in the script, we did see a nice growth in***
     ***sample volume year over year for the prior quarter, and it is a very key objective***
7    ***for us to continue that trajectory***.  And so we will keep you posted as this goes
     through.  And also tracking sample volume going forward becomes a little bit more
8    complex because we are mixing buccal swab volume with blood volume.  But that
     being said, we are expecting a nice growth for the year.
9
10          163.    On May 11, 2009, Celera filed with the SEC its 1Q 2009 Form 10-Q.  The Form 10-Q

11   was signed by defendants Ordonez and DeBlasi.  Celera's Form 10-Q false and misleadingly

12   reported a ***$1.4 million net loss, or $0.02 per share, SG&A expenses of $25.2 million, net accounts***

13   ***receivable of $49.5 million and a $21.1 million allowance for doubtful accounts***.

14          164.    The Form 10-Q for 1Q 2009 also included the following false and misleading

15   statements:

16          ***SG&A expenses increased by $4.0 million*** for the three months ended March
     28, 2009 compared to the prior year quarter, primarily due to an increase of $1.7
17   million for costs associated with the expansion of sales efforts and ***$2.3 million due***
     ***to an increased allowance for doubtful accounts at BHL.  We have experienced an***
18   ***increased aging of our non-contractual payor and patient receivables as a result of***
     ***changing and inconsistent payment patterns***.

19                            *       *       *

20          ***Our revenues are highly dependent on our clinical laboratory tests and***
     ***diagnostic products being approved for reimbursement*** by Medicare and other
21   government healthcare programs, as well as private insurance companies and
     managed care organizations, commonly referred to, collectively, as "third-party
22   payors." ***Although most third-party payors currently have approved most or all of***
     ***our clinical laboratory tests and the use of our diagnostic products for***
23   ***reimbursement, this could change if they determine that these tests and products***
     ***are not medically necessary or otherwise not approved for reimbursement*** under
24   standards independently established by these third-party payors, which may take into
     consideration factors such as the investigational nature of a particular test or product,
25   or whether less expensive alternatives are available.  Each third-party payor makes
     its own decision as to whether a given diagnostic test is medically necessary and
26   worthy of payment.  If Medicare or any other third-party payor determines that any
     one or more of our clinical laboratory tests are not medically necessary or are not
27   otherwise suitable for reimbursement, healthcare providers could be reluctant to
     prescribe these tests.  Similarly, if the use of our diagnostic products is not approved
28   for reimbursement, purchasers of any one or more of these products could decrease

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                                    - 57 -

or eliminate their orders of these products. Any change by one or more third-party payor with regard to their existing reimbursement practices could impact the tests and products we offer, the revenue received on each of the tests and products we sell and harm our operating results and financial condition

\*       \*       \*

Missing or incorrect information on requisitions adds complexity to and slows the billing process, creates backlogs of unbilled requisitions, and generally increases the aging of accounts receivable and our allowance for doubtful accounts. **We believe that a portion of our allowance for doubtful accounts is attributable to the lack of, or inaccurate, billing information.**

**Reasons Why Defendants' 1Q 2009 Statements Were Materially False and Misleading**

165.    Defendants' May 2009 statements concerning Celera's 1Q 2009 reported income, earnings, net A/R and expenses violated basic accounting standards and were false and misleading. Celera failed to adequately maintain its global A/R reserves as required by SFAS No. 5 which requires that an estimated loss from a loss contingency be accrued by a charge to income if: (a) information available prior to issuance of the financial statements indicates that it is probable than an asset had been impaired (here, BHL's A/R); and (b) the amount of the loss can be reasonably estimated. *See* SFAS No. 5, ¶8. Even if one or both of these conditions are not met (which they were), defendants were still required to disclose the loss contingency where there is at least a "reasonable possibility" that a loss or an additional loss may have been incurred. *See* SFAS No. 5, ¶10.

166.    As described in detail in ¶¶63-82, defendants knew that it was probable that Celera's A/R was impaired and that as a result the allowance for doubtful accounts recorded as of 1Q 2009 was inadequate in violation of SFAS No. 5 and GAAP, based on the following:

(i) approximately half of the Celera's lab service revenue was from out-of-network providers who were not contracted to pay a set amount for the services, increasing the risk that the third-party payor may deny the claim or pay less than the billed amount;

(ii) that as described by CW2 in ¶¶37-38, 46 and later admitted by defendants as described in ¶¶10, 21, Blue Cross/Blue Shield representing approximately 20% of the sample volume of BHL's lab services was remitting payment to individual patients, not Celera, thereby impacting Celera's collection activities and exposing Celera "to additional bad-debt risk";

(iii) that despite knowledge in April 2008 of a significant and noticeable trend in unpaid receivables owed by Blue Cross/Blue Shield and knowledge that Blue Cross/Blue Shield had been sending payment to individual patients for BHL test

services since early 2008, Celera did not even send collection letters to these individual patients until the receivables had been outstanding for months and virtually uncollectible, according to CW1 and CW2. ¶¶37-38, 46. By the end of 1Q 2009, defendants were well aware of the results of these collection efforts as it was approximately 90 says since the collection letters were sent and defendants by their own admission "closely monitored" collections;

(iv) By 1Q 2009, Celera, by defendants' own belated admission in July 2009 that it would write-down $20.1 million in doubtful accounts that were over 360 days outstanding as of June 27, 2009, had approximately $20 million or more of receivables that were more than 200 days outstanding;

(v) that the DSO for 1Q 2009 was 98, a metric figure that was abnormally high compared to the median industry DSO of 40 days;

(vi) that the detailed aging reports described by CW1 in ¶41 informed defendants of the age of BHL's receivables and the associated payor;

(vii) that the budgets and forecasts reviewed by the Individual Defendants alerted them to the insufficiency of Celera's allowance for doubtful accounts (¶¶49-52);

(viii) that allowance for doubtful accounts as a percentage of net receivables, a common metric for assessing collectibility and the quality of receivables, was 42.6%, more than four times the 10% or less reported by Celera's publicly traded "peer companies"; and

(ix) as admitted in Celera's Form 10-Q for 1Q 2009, filed on May 11, 2009, "a significant portion of our accounts receivable is owed to us by individual patients" and collections from individuals were increasingly difficult in the current economic environment.

167.    While defendants partially disclosed that Celera had experienced an increase in SG&A expenses ($25.3 million) in 1Q 2009, including "a $2.3 million increase in the allowance for doubtful accounts" over the prior year quarter, defendants continued to mislead investors by failing to sufficiently accrue for Celera's impaired A/R, in accordance with SFAS No. 5 and other accounting standards or write-off Celera's doubtful accounts in accordance with its stated policy in its 2009 Form 10-K.  Additionally, defendants continued to conceal material adverse facts, including that Celera's bad debt was in large part due to failure of Celera to send out collection letters to Blue Cross/Blue Shield patients until a year after this insurance carrier stopped remitting payment directly to Celera, creating a large probability that Celera would never collect on these outstanding receivables.

168.    Despite the increasing loss in clients as a result of Celera's billing practices, described in detail at ¶¶37-38, 43-48, 61-62, defendants reiterated prior guidance of 2009 revenues of $192-

1  $202 million (compared to 2008 calendar revenues of $175 million) and sample volume growth of

2  more than 20%.  Defendants knew this guidance was seriously undermined by Celera's eroding

3  physician base.  Volume and billing reports as well as forecasts/budgets informed defendants of the

4  increasing loss in sales that would render it impossible to achieve this guidance.

5         169.    Defendants also reiterated 2009 guidance of SG&A expenses of $102-$112 million

6  despite their knowledge that Celera's A/R was impaired, as described in ¶156 above, and their

7  admission that a significant portion of their receivables were owed by individuals, thereby increasing

8  the risk to Celera's A/R.

9         170.    Additionally, defendants indicated that while most third-party payors "currently have

10  approved our clinical laboratory tests," the denial of tests for reimbursement from third-party payors

11  could have an adverse financial impact.  These statements were false and misleading because, for

12  example: (i) as CW4 explained, Celera's new genetic tests, which were part and parcel to Celera's

13  business model were considered experimental and thus non-reimbursable by most insurance

14  companies (¶61); and (ii) UnitedHealth had already communicated that it considered certain tests to

15  be experimental and deny reimbursement but, as explained by CW2 (¶40), defendants continued to

16  record revenue for these tests and failed to write-off the amounts recorded in the period in which the

17  revenue was recorded.  As such, the denial of reimbursements was already impacting Celera's

18  financial condition.

19  **Defendants Signed False Statements Regarding Celera's Internal Controls and Procedures**

20         171.    Defendants Ordoñez and Jung signed Sarbanes-Oxley ("SOX") certifications

21  accompanying Celera's fiscal year-end Form 10-K, filed on September 8, 2008, Form 10-Q for

22  calendar 3Q 2008, filed on November 12, 2008 and Form 10-KT for calendar year-end 2008, filed

23  on March 25, 2009.  Defendants Ordoñez and DeBlasi also filed SOX certifications accompanying

24  Celera's Form 10-Q for 1Q 2009, filed on May 11, 2009.  Each certification stated in pertinent part:

25        2.    Based on my knowledge, ***this report does not contain any untrue statement
26  of a material fact or omit to state a material fact necessary to make the statements
   made, in light of the circumstances under which such statements were made, not
   misleading with respect to the period covered by this report***;

27        3.    Based on my knowledge, ***the financial statements, and other financial
28  information included in this report, fairly present in all material respects the***

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                        - 60 -

*financial condition, results of operations* and cash flows *of the registrant as of, and for, the periods presented in this report*;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a.      *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed* under our supervision*, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.*

172.    Defendants Ordoñez and Jung also signed Celera's Form 10-KT for the calendar year-end 2008, filed with the SEC on March 25, 2009, that included the additional following assurances concerning Celera's internal controls.

*The internal control over financial reporting at the Company was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America.* Internal control over financial reporting include those policies and procedures that:

1.  *pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;*

2.  *provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States of America;*

                    *            *            *

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 27, 2008.  Management based this assessment on criteria for effective internal control over financial reporting described in "Internal Control – Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").  Based on this assessment, the *Company's management determined that, as of December 27, 2008, the Company maintained effective internal control over financial reporting*.

173.    Additionally, defendants Ordoñez and Jung signed Celera's Form 10-Q for calendar 3Q 2008, filed on November 12, 2008 and defendants Ordoñez and DeBlasi signed Celera's Form 10-Q for 1Q 2009, filed on May 11, 2009.  Both filings adopted the previous internal control assurances set forth in ¶172 by stating there had been no change in internal control over financial reporting that occurred during the previous reporting period.

**Reasons Why Defendants' Internal Controls and Procedure Statements Were Materially False and Misleading**

174.   Defendants' statements concerning Celera's internal controls and procedures and SOX certifications were false and misleading.  As detailed herein, Celera's faulty internal controls and procedures caused Celera to falsely report its financial results included in publicly issued financial statements, press releases and conference calls, which improperly inflated the Company's earnings and understated expenses.

175.   Management of any public company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in 15 U.S.C. §78m-o under the 1934 Act.  AU 319.06, Internal Control in a Financial Statement Audit, defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations."

176.   Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP]."  15 U.S.C. §78m(b)(2).  These provisions require an issuer to employ and supervise reliable personnel to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

177.   Here, defendants claimed Celera's internal control procedures complied with the standards adopted by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").  The COSO standards constitute a specific internal control model, and require adopting entities to have: (i) a disciplined and structured control environment; (ii) direct involvement by management in identifying and analyzing internal control risks, rather than reliance on auditors;

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                                                                      - 62 -

(iii) formal policies, procedures and practices that ensure control activities are being properly carried out; (iv) accurate and timely communication of control responsibilities to employees; and (v) continual monitoring by management of the controls through formalized procedures or checklists.  Had defendants followed these control guidelines as they represented, the falsity of Celera's income and earnings pled herein would have been well known to defendants.

178.    Indeed, manual adjustments evidence a lack of the very internal controls defendants claimed existed.  For example, Celera/BHL had a contractual relationship with UnitedHealth.  According to CW1, there were approximately 20 individual tests that were part of BHL's "cardiovascular advanced panel," but three or so of these tests were considered "investigational" and therefore were not reimbursable by UnitedHealth.  Nonetheless, BHL billed UnitedHealth for the full amount of all the tests that had been performed.  If BHL did not receive reimbursement, they wrote off the amount that was not paid, which was an example of "no balance billing."

179.    UnitedHealth utilized electronic remittance in which a contracted service provider such as BHL would electronically retrieve a file from the UnitedHealth clearing house.  The funds retrieved would then be automatically posted by BHL to the oldest receivables owed by UnitedHealth, which included the receivables for non-reimbursable tests.  The automatic posting applied payments to whatever BHL had listed as receivables for UnitedHealth and did not account for those tests for which it was known UnitedHealth would not be reimbursing.  As such, *defendants had to manually adjust those non-reimbursable receivables to which UnitedHealth payments had been applied and manually write-off those receivables*.  BHL did not attempt to collect these unpaid amounts from the individual patients.  CW1 stated that it *could take six months before some incorrectly posted receivables were adjusted and written off*.  Hence, the information in the Company's aging buckets would be misleading and could result in inadequate write-offs due to the fact that it appeared as though there were fewer old outstanding receivables than there really were.

180.    Likewise, material information such as the lack of collection from Blue Cross/Blue Shield patients, had defendants in place the procedures and controls they claimed, would have been readily apparent to management at the beginning of the Class Period and informed defendants that Celera's financials did not fairly present its financial condition.

181.     Celera's financial statements contained untrue statements and omitted material facts as alleged herein.  Defendants' attestation to the sufficiency of disclosure controls and procedures misled investors into believing that Celera's Class Period financials fairly represented the financial condition of the Company when, in fact, they materially overstated Celera's bottom-line.

**The End of the Class Period**

182.     On July 22, 2009, after the market closed, the Company issued a press release entitled "Celera Announces Preliminary Second Quarter 2009 Revenue Results," which stated in part:

> Celera Corporation today reported preliminary revenue results for the quarter ended June 27, 2009.  *The Company announced that it expects to report revenue for the second quarter of 2009 in the range of $40 million to $42 million.* The Company reported revenue of $42.8 million in the second quarter of 2008.
>
> *Second quarter 2009 revenues relative to the prior year quarter are expected to show a reduction for the Company's Lab Services business, conducted by Berkeley HeartLab (BHL)*, mid-single digit percentage growth for the Products business, and a decline in licensing revenue in the Corporate segment.
>
> *Lab Services revenues were adversely affected by* lower than anticipated sample volume due to broad economic pressures, *lost business as a result of the Company's efforts to collect aged receivables, and the denial of reimbursement on a number of legacy BHL tests by certain payors in some regions*.  Overall, reimbursement rates, reflecting the impact of denied tests and historical collection activities, declined from both the second quarter of 2008 and the first quarter of 2009.  The reduction in Corporate segment revenue in the second quarter of 2009 compared to the prior year period was due to the completion of payments by one licensee, which was anticipated, as well as reduced royalty revenue received from another licensee.
>
> *         *         *
>
> *Celera expects to record significant charges in the second quarter of 2009 for bad debt expense* and impairment of goodwill and intangible assets.  *Celera expects to have 2009 revenues significantly below its present guidance for the year and hereby withdraws its 2009 guidance.*  Celera expects to discuss its outlook for 2009 when it reports its second quarter 2009 results on August 6, 2009.

183.     On this news, Celera's stock tumbled $1.91 per share to close at $5.83 per share on July 23, 2009, a one-day decline of nearly 25% on volume of 7.9 million shares, over 16 times the average three-month volume.

184.     Following the July 22, 2009 press release, defendants uncharacteristically held their earnings conference call two weeks later on August 6, 2009, wherein they explained that:

**Kathy Ordonez – *Celera Genomics – CEO***

1              *      *      *

2       This is been a challenging period for us, and we're disappointed with the results we posted for the second quarter of 2009. As we disclosed in July, we saw

3  revenues contract over the prior-year quarter, and this shortfall, combined with the write-down for bad debt at Berkeley HeartLab, translated into a substantial loss for

4  the quarter.

5              *      *      *

6       Focusing first on BHL, revenue for the quarter was $25.2 million. You may recall that in our conference call with investors last quarter, **we indicated that we had**

7  **not yet seen an impact on our business from the worsening economy through the end of the first quarter**. Unfortunately, however, during the recently completed

8  quarter we **did not experience the pickup in sample volume** that we had observed during the last four sequential quarters when the sample volume grew at an average

9  of 20% per quarter over the prior year. Indeed, in the second quarter of 2009 compared to the prior-year quarter, **BHL's sample volume grew by only 2% as we**

10 **lost accounts due to our efforts to collect aging receivables in addition to the broad economic conditions noted above**.

11      As noted in our preannouncement, **we also have experienced a pattern of**

12 **sporadic denial of reimbursement** from certain payers in some territories. For example, in June we were advised by our largest private insurance carrier that they

13 would not pay retroactively for certain BHL legacy tests such as homocysteine, HDL2b, APO-B and APO-E. We are contesting this reversal of coverage based on

14 local coverage determinations.

15      Meanwhile, Medicare and most other PPOs are paying on these tests. It is a complex situation, and we are trying to both reverse these denials and adjust our

16 business practices to accommodate them. One of the highest priorities at BHL has been to improve our collections, reduce DSO and move more of our payers under

17 contract. To that end, one of our largest private payers moved under contract in early April and is now paying within two to three weeks. Currently, approximately 55% of

18 BHL's sample volume is either derived from the Medicare or contracted private payer patients. **We intend to continue efforts to increase the contracted proportion**

19 **of samples covered over the coming months, which is expected to negatively impact revenues but improve collections and predictability in managing the business**.

20      In the meantime, we've collected approximately $25 million during the second quarter of 2009 compared to average quarterly collection rates of about $21

21 million for the past three quarters. We hope to sustain this level of collections. Moreover, **we think we have made the prudent decision to write off all accounts**

22 **over 360 days and tests that have been denied for reimbursement**.

23 **Ugo DeBlasi – Celera Genomics – CFO**

24      Thank you, Kathy. **Revenues for the second quarter of 2009 were $41.4**

25 **million** compared to $42.7 million for the second quarter of 2008. For the second quarter of 2009 Celera reported a net loss of $31.7 million or $0.39 per share

26 compared to a net loss of $104.1 million or $1.30 per share in the prior-year quarter. Results for both periods included items that affected the comparability of results. A

27 breakdown of these items is listed in the reconciliation table in today's release and posted on our website.

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                                    - 65 -

These items increased the net loss for the second quarter of 2009 by $12.6 million. The net loss on a non-GAAP basis excluding the items listed in the reconciliation table was $19.1 million or $0.23 per share for the second quarter of 2009 compared to a net loss of $1.1 million for $0.01 per share for the prior-year quarter. *Included in the determination of net loss for the second quarter of 2009 was an allowance for doubtful accounts charge of $20.1 million or $0.25 per share.* This compares to an allowance for doubtful accounts expense of $4.3 million or $0.05 per share in the second quarter of 2008. *SG&A expenses for the second quarter of 2009 were $41.1 million* compared to $25.2 million in the prior-year quarter. *This increase was primarily due to the provision for BHL's accounts receivable over 360 days old and tests that have been denied for reimbursement. These balances were primarily due from patients.*

We believe this assessment reflects our recent collection efforts, current business conditions and future expectations.

Excluding the allowance for doubtful accounts, SG&A expenses for the second quarter of 2009 were $21 million or 50.7% of revenues compared to $20.9 million or 48.9% of revenues in the prior-year quarter. The allowance for doubtful accounts in the second quarter of 2009 was $20.1 million or 48.6% of revenues, and days sales outstanding were 68.

This compares with an allowance for doubtful accounts of $5.1 million or 11.2% of revenues, and DSO were 98 in the first quarter of 2009. *We have taken steps to address our aging of accounts receivable* and will continue to implement changes that we believe will mitigate our exposure to bad debt. *Our anticipated move to contract with additional out-of-network payers is expected to positively improve efficiencies in this area.*

\* \* \*

*For 2009, total revenues are anticipated to be $160 million to $170 million. For 2009, SG&A expenses are anticipated to be $110 million to $118 million.* The expected SG&A expense includes the $20.1 million provision for doubtful accounts in the second quarter of 2009 as well as our anticipated incremental investment to increase commercialization efforts around the genetics programs. R&D expenses for 2009 are anticipated to be $28 million to $32 million.

For the second half of 2009, Celera anticipates a loss of $5 million to $9 million or $0.06 to $0.11 per share on a non-GAAP basis. The loss in the third quarter is expected to be $0.05 to $0.07 per share on a non-GAAP basis, which reflects that the impact of the expected cost savings from the announced restructurings will not be fully realized until the fourth quarter.

185. Following the scripted portion of the August 6, 2009 conference call, analysts questioned defendants as follows:

**Sara Michelmore -** *Cowen and Company – Analyst*

I was just *hoping you could expand a bit on this concept of the BHL volumes being lower than expected because you lost accounts as part of the collection efforts.* Can you just explain exactly what happened and what that dynamic is?

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                    - 66 -

* * *

**Chris Hall - *Celera Genomics - Chief Business Officer, Berkeley HeartLab***

What we did is ***we aggressively went after trying to improve our collections process, and that's a combination of trying to collect co-pays, deductibles and checks that may have been sent to patients from insurance carriers. And all that combined as we go after patients in this economic environment particularly, that can be a stressful experience.*** They typically will either call us or they'll go in and see their physician. And when they go in and see their physician, that can cause frustration from the physician from having to deal with it from a customer service standpoint. If that plays out a couple of times, that ***can lead to reduced volume from the physician, or it can lead to a lost account***. And so, when Kathy talked about that dynamic that we've seen play out, that's the dynamic that we've seen play out in some cases.

**Sara Michelmore - *Cowen and Company – Analyst***

And it ***must have been on a wide scale to have this type of impact. How much of the difference between the volume growing 2% and 20% would you attribute to that dynamic versus just general economic slowdown?***

**Kathy Ordonez – *Celera Genomics – CEO***

I'm not sure that we can cut it that closely because there's always a bounce in the sample volume, and a physician can be disappointed in having to deal with a patient about a collections issue, and he may not order a Berkeley profile for a couple of weeks. But then other patient comes in that he thinks it would be useful on, and he changes his mind. So it's something that is too dynamic to put our hands around. ***But we want to be transparent in telling you that this is not just economic climate, that this issue is a combination of collection activities, which, frankly, we felt were necessary against a background of economic conditions.***

186. Defendant Ordoñez also during the August 6, 2009 conference call disclosed that:

Ugo raises a very important point that I don't know if we have pointed to, ***but one of our major carriers had, for a period of time, a practice of, rather than paying us for the testing, sending a check to the patient. That is no longer occurring. But chasing down that money from individual patients has been difficult because, even though they got the check from the carrier, they sometimes forgot that they got the check or are reluctant to turn it over to us.*** So we believe, at least as we are sitting here today, that that issue is not happening.

187. Additionally, during the same conference call, defendants responded to questions regarding revenue guidance and sales volume:

**Ashim Anand - *Natixis – Analyst***

In terms of top-line guidance, and this might be – you might not be able to give an exact number, but just a feel – ***if your top-line guidance has been reduced by 17%***, obviously unemployment-related issues have been there. So if you can kind of, in that 17% reduction, if you can box out approximately what is the contribution from Berkeley Heart-related issues, what's the macro economy?

**Kathy Ordonez - *Celera Genomics – CEO***

Well, we don't break out the revenue outlook by segment. But as we've talked about, we've had a ***considerable setback in the growth of BHL***, as we talked around the sample volume. And we've also had recent reductions in forecasts for the sequencing-based products that we manufacture here.

**Ashim Anand - *Natixis – Analyst***

I was not asking for exact breakdown. In terms of just thinking about projections, you know, obviously you have to figure out there is a general macroeconomic issue. And then there are issues specific to BHL. So I was wondering like maybe half-and-half? Is that a fair assessment?

**Ugo DeBlasi - *Celera Genomics – CFO***

What I would call it, ***without giving out any specific numbers, is primarily BHL*** and then, to a lesser degree, the Products group.

188.     On August 6, 2009, the Company also issued its 2Q 2009 results in a press release, which confirmed the statements contained in the Company's July 22, 2009 announcement concerning a dramatic increase in its bad debt expense and lowered guidance. The press release stated in part:

- Revenue by segment for the second quarter of 2009 was as follows:

  o  ***Lab Services revenue was $25.2 million*** compared to $25.8 million in the prior year quarter, ***primarily as a result of lower reimbursement rates***. Overall, reimbursement rates, ***reflecting the impact of denied tests and historical collection activities, declined from both the second quarter of 2008 and the first quarter of 2009***. ***Sample volume*** grew marginally year over year and ***was negatively impacted by*** broad economic pressures and ***lost business as a result of the Company's efforts to collect aged receivables***;

                        *        *        *

- ***SG&A expenses for the second quarter of 2009 were $41.1 million compared to $25.2 million in the prior year quarter. Allowance for doubtful accounts in the second quarter of 2009 was $20.1 million compared to $4.3 million in the prior year quarter. This increase was primarily due to the provision for BHL's accounts receivable over 360 days old and tests that have been denied for reimbursement. These balances were primarily due from patients. Excluding the allowance for doubtful accounts, SG&A expenses for the second quarter of 2009 were $21.0 million, or 50.7% of revenues, compared to $20.9 million, or 48.9% of revenues in the prior year quarter***.

- ***In the second quarter of 2009, allowance for doubtful accounts was $20.1 million, or 48.6% of revenues***, and days sales outstanding were 68. Days sales outstanding in the second quarter of 2009 benefited from the increased provision for allowance for doubtful accounts in the quarter. This compares

with allowance for doubtful accounts of $5.1 million, or 11.2% of revenues, and DSO of 98 in the first quarter of 2009.

189.    On November 9, 2009, Celera reported a 24% decline in revenues for 3Q 2009 for the prior year explaining in its Form 10-Q that:

> Revenues from our Lab Services segment for the three months ended September 26, 2009 decreased $5.9 million compared to the three months ended September 27, 2008. *The decrease was primarily due to lower reimbursement rates, reflecting the continued impact of denied tests and historical collection activities* . . . .

## ADDITIONAL ALLEGATIONS OF SCIENTER-EXECUTIVE COMPENSATION

190.    Celera's executive compensation plan provided personal financial incentive for defendants to defraud Celera shareholders.  Defendants' compensation packages during the Class Period consisted of a base salary, annual incentive compensation, long-term and equity incentive compensation and benefits.  The annual incentive compensation was based on a percentage of an executives' base salary (the percentage was determined by a benchmark study and internal determinations) and a business modifier.  The business modifier included threshold, target and out performance goals for three financial metrics, which were revenue, gross profit and operating expenses.  Both gross profit and expenses were misstated throughout the Class Period.  Moreover, various forms of defendants' equity incentive compensation vested based on per-established business or performance goals.

191.    For 2009, defendants' incentive compensation was dependent on meeting revenues of $201.6 million, $139.9 million in gross profit and $141.8 million in operating expenses.

192.    Further, according to Celera's proxy statement, filed on April 10, 2009, defendants' compensation for the six-month transition period (July 1, 2008 to December 27, 2008) was premised on hitting revenue targets of $93 million and EBIT (Earnings Before Income Tax) of $1.6 million, defendants exceeded these targets and as a result received greater compensation.

193.    Celera's incentive compensation motivated defendants to falsely report Celera's financial condition throughout the Class Period.

194.    Defendants' compensation during the relevant period includes the following:

1    (i) Defendant Ordoñez' total compensation for the six-month transition reporting
     period from July 1, 2008 to December 27, 2008 was $688,970 and her total
2    compensation for year-end 2009 was over $1.5 million;

3    (ii) Defendant Jung's compensation for the six-month transition period from July 1,
     2008 to December 27, 2008 was $232,932 and his total compensation for year-end
4    2009, in which he was employed by Celera for four months, was $419,046; and

5    (iii) Defendant DeBlasi's compensation for year-end 2009 was over $1 million.

6    **ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS**

7          195.    By misrepresenting Celera's financial results, defendants presented a misleading

8    picture of Celera's business and financial prospects, artificially inflating Celera's stock price.

9    Instead of revealing during the Class Period, *inter alia*, that: (i) Celera's financial results were false

10   as a consequence of Celera's impaired A/R which was not written-off or properly accrued for; (ii)

11   Celera relied substantially on individual patients for reimbursement who's receivables were months

12   old due to non-collection which inherently raised Celera's bad debt risk; (iii) Celera lacked sufficient

13   internal control and procedures; and (iv) that Celera was losing clients and witnessing a significant

14   drop in business volume, defendants falsely reported Celera's business prospects, financial results

15   and financial guidance.  Defendants' false statements inflated the price of Celera stock to a level that

16   it would not have traded at had the true financial condition and other material facts concealed from

17   investors been revealed at an earlier date, as detailed herein.  The artificial inflation was eliminated

18   when the financial conditions, risks and other information concealed by defendants' scheme were

19   revealed to the market as reflected in the following chart:

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



196. Beginning in February 2009, defendants began to partially disclose the business/financial conditions and risks concealed from investors by defendants' scheme to defraud. While the disclosure was incomplete, it revealed partially the business and financial conditions concealed by defendants' fraudulent scheme and the concealed materialization of risks to the Company, leading to a price decline that partially corrected Celera's stock price by reducing the extent which it had been inflated by defendants' fraudulent scheme, thereby injuring lead plaintiff and other members of the Class who purchased Celera stock during the Class Period at artificially inflated prices as a result of the fraudulent scheme and false and misleading statements alleged in ¶¶2-21, 37-41, 43-52, 55, 181, 190-194.

197. On February 17, 2009, after the market closed, the Company announced: (i) an increase in its DSO "as a consequence of an increased aging of the BHL non-contracted payor and patient receivables"; (ii) an increase in Celera's SG&A expenses by 34% over the prior year period

1   with "the single major driver [being] an increased allowance for bad debt at BHL"; and (iii) a $3.7

2   million increase in allowance for bad debt over the prior year.  As a direct result of defendants'

3   partial disclosures, the following day, Celera's stock fell over 26% on heavy trading volume causing

4   damages to investors who had purchased their shares that had been fraudulently and artificially

5   inflated by defendants' false statements and material omissions.  The Company's stock price

6   remained artificially inflated, however, because defendants continued to conceal adverse material

7   facts regarding Celera's bad debt and issue false financial guidance.

8           198.    Following this partial disclosure, analysts indicated that the disclosure of the factors

9   contributing to the increase in bad debt allowance were reflected in the analysts' new and lower

10  guidance.  Later, analysts at Thomas Weisel Partners confirmed that the increased bad debt

11  allowance contributed to the market's negative reaction to the February 17, 2009 announcement and

12  the stock price decline.  Indeed, on March 23, 2009, an analyst from Thomas Weisel Partners

13  reported that the February 17, 2009 disclosure of the bad debt allowance contributed Celera's stock

14  decline, issuing a report that included a section titled, "Low Visibility on Guidance, Sales Cycle

15  Issues at BHL Led Stock Decline."

16          199.    On July 22, 2009, after the market closed, Celera shocked investors in a press release

17  announcing preliminary 2Q 2009 results and cost-saving measures.  Defendants announced that

18  Celera's bad debt was actually far worse than previously reported.  The Company admitted that it

19  expected to "record significant charges in the second quarter of 2009 for bad debt expense" and that

20  "Celera expect[ed] to have 2009 revenues significantly below its present guidance for the year" and

21  withdrew its 2009 guidance, explaining that 2Q 2009 revenues were expected to "show a reduction

22  for the Company's Lab Services business."  Defendants explained that lab services revenues "were

23  adversely affected by lower than anticipated sample volume due to broad economic pressures, lost

24  business as a result of the Company's efforts to collect aged receivables, and the denial of

25  reimbursement on a number of legacy BHL tests by certain payors."  Defendants also revealed that

26  "[o]verall, reimbursement rates, reflecting the impact of denied tests and historical collection

27  activities" declined for the quarter.  In reaction to these disclosures, Celera stock price closed at

28  $5.83 per share on July 23, 2009, down nearly 25% from $7.74 per share one day earlier.

1    200.    The stock decline removed the fraud and created inflation from Celera's stock price,

2   causing economic loss to investors who had purchased the stock during the Class Period.

3                            **CLASS ACTION ALLEGATIONS**

4    201.    Lead plaintiff brings this action as a class action pursuant to Federal Rule of Civil

5   Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired

6   shares of Celera common stock during the Class Period and who were damaged thereby (the

7   "Class").[14]   Excluded from the Class are defendants and their family members, the officers and

8   directors of the Company, at all relevant times, members of their immediate families and their legal

9   representatives, heirs, successors or assigns and any entity in which defendants have or had a

10   controlling interest.

11    202.    The members of the Class are so numerous that joinder of all members is

12   impracticable.  The disposition of their claims in a class action will provide substantial benefits to

13   the parties and the Court.  Celera has over 81 million shares of stock outstanding, owned by

14   hundreds if not thousands of persons.

15    203.    There is a well-defined community of interest in the questions of law and fact

16   involved in this case.  Questions of law and fact common to the members of the Class which

17   predominate over questions which may affect individual Class members include:

18            (a)    whether the 1934 Act was violated by defendants;

19            (b)    whether statements made by defendants to the investing public during the

20   Class Period misrepresented material facts about the finances, business, operations and management

21   of Celera;

22            (c)    whether statements made by defendants omitted material facts necessary to

23   make the statements, in light of the circumstances under which they were made, not misleading;

24            (d)    whether the price of Celera stock was artificially inflated; and

25   _____

26   [14]    This includes purchasers of Celera Group, a tracking stock of Applera Corporation, which
     traded on the New York Stock Exchange under the ticker CRA and Celera Corporation once it split-
27   off on July 1, 2008 to become an independent publicly trade company on the NASDAQ under the
     ticker CRA.

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                              - 73 -

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

204.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

205.    Lead plaintiff's claims are typical of those of the Class because lead plaintiff and the Class sustained damages from defendants' wrongful conduct.

206.    Lead plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead plaintiff has no interests which conflict with those of the Class.

207.    A class action will achieve economies of time, effort and expense and provide uniformity of decision to the similarly situated members of the Class without sacrificing procedural fairness or bringing about other undesirable results.  Class members have not indicated an interest in prosecuting separate actions as none have been filed.  The number of Class members and the relatively small amounts at stake for individual Class members make separate suits impracticable. No difficulties are likely to be encountered in the management of this action as a class action.

208.    In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy because the questions of law and fact common to the Class predominate over any questions affecting only individual Class members.  Although individual Class members have suffered disparate damages, the fraudulent scheme alleged and the misrepresentations and omissions causing damages are common to all Class members.  Further, there are no individual issues of reliance that could make this action unsuited for treatment as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

209.    At all relevant times, the market for Celera common stock was an efficient market for the following reasons, among others:

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                - 74 -

(a)     Celera Group's tracking stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     Celera common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(c)     As a regulated issuer, Celera filed periodic reports with the SEC and the NASDAQ and prior to that Celera Group's financials were filed in periodic reports by its parent Applera Corporation;

(d)     Celera regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     Celera was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

210.    As a result of the foregoing, the market for Celera common stock promptly digested current information regarding Celera from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Celera common stock during the Class Period suffered similar injury through their purchase of Celera common stock at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

211.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements and at the time the purportedly forward-looking statements were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Celera who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

212.    Lead plaintiff incorporates ¶¶1-211 by reference.

213.    During the Class Period, the Company and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

214.    These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon lead plaintiff and others similarly situated in connection with their purchases of Celera common stock during the Class Period.

215.    Lead plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Celera common stock.  Lead plaintiff and the Class would not have purchased Celera common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

216.    Lead plaintiff incorporates ¶¶1-215 by reference.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10-cv-02604-JW(HRL)                                                   - 76 -

1    217.    The Individual Defendants acted as controlling persons of Celera within the meaning

2   of §20(a) of the 1934 Act.  By reason of their positions with the Company, their ownership of Celera

3   stock, the nature of Celera's business and the small size of the Company, and their review and

4   control of the press releases, conference call statements and financial statements, the Individual

5   Defendants had the power and authority to cause Celera to engage in the wrongful conduct

6   complained of herein.  Celera controlled its BHL division, the Individual Defendants and all of its

7   employees.  It also had the power to control the financial information disseminated in Applera's SEC

8   filings prior to Celera's split effective July 1, 2008.  By reason of such conduct, defendants are liable

9   pursuant to §20(a) of the 1934 Act.

10                                       **PRAYER FOR RELIEF**

11         WHEREFORE, lead plaintiff prays for judgment as follows:

12         A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

13         B.    Awarding lead plaintiff and the members of the Class damages, including interest;

14         C.    Awarding lead plaintiff reasonable costs and attorneys' fees; and

15         D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

16   proper.

17                                         **JURY DEMAND**

18         218.    Lead plaintiff demands a trial by jury.

19   DATED:  October 15, 2010                     ROBBINS GELLER RUDMAN
                                                      & DOWD LLP
20                                                 WILLOW E. RADCLIFFE

21

22                                                      _____/s/_____
                                                   WILLOW E. RADCLIFFE
23
                                                   Post Montgomery Center
24                                                 One Montgomery Street, Suite 1800
                                                   San Francisco, CA  94104
25                                                 Telephone:  415/288-4545
                                                   415/288-4534 (fax)
26

27

28

581621_1

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 10-cv-02604-JW(HRL)                                              - 77 -

1
2           ROBBINS GELLER RUDMAN
               & DOWD LLP
3           RYAN A. LLORENS
            655 West Broadway, Suite 1900
4           San Diego, CA  92101
            Telephone:  619/231-1058
5           619/231-7423 (fax)

6           Lead Counsel for Plaintiff

7           VANOVERBEKE MICHAUD &
               TIMMONY, P.C.
8           MICHAEL J. VANOVERBEKE
            THOMAS C. MICHAUD
9           79 Alfred Street
            Detroit, MI  48201
10          Telephone:  313/578-1200
            313/578-1201 (fax)

11          GLANCY BINKOW & GOLDBERG LLP
            LIONEL Z. GLANCY
12          ROBERT V. PRONGAY
            1801 Ave. of the Stars, Suite 311
13          Los Angeles, CA 90067
            Telephone:  310/201-9150
14          310/201-9160 (fax)

15          Additional Counsel for Plaintiff

16
17
18
19
20
21
22
23
24
25
26
27
28

1  CORRECTED CERTIFICATION OF NAMED PLAINTIFF
   PURSUANT TO FEDERAL SECURITIES LAWS
2

3      WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM
4  ("Plaintiff") declares:

5      1.    Plaintiff has reviewed a complaint and authorized its filing.

6      2.    Plaintiff did not acquire the security that is the subject of this action at the
7  direction of plaintiff's counsel or in order to participate in this private action or any
8  other litigation under the federal securities laws.

9      3.    Plaintiff is willing to serve as a representative party on behalf of the
10 class, including providing testimony at deposition and trial, if necessary.

11     4.    Plaintiff has made the following transaction(s) during the Class Period in
12 the securities that are the subject of this action:

13 | Security | Transaction | Date | Price Per Share |
14

15                        *See* attached Schedule A.

16     5.    Plaintiff has not sought to serve or served as a representative party in a
17 class action that was filed under the federal securities laws within the three-year
18 period prior to the date of this Certification except as detailed below:

19        *In re Piedmont Office Trust Inc. Sec. Litig.*, No. 1:07-cv-02660-CAP (N.D. Ga.)

20

21

22

23

24

25

26     6.    The Plaintiff will not accept any payment for serving as a representative
27 party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,
28

CELERA

1  except such reasonable costs and expenses (including lost wages) directly relating to
2  the representation of the class as ordered or approved by the court.
3      I declare under penalty of perjury that the foregoing is true and correct.
4  Executed this 31 day of August , 2010.
5                          WASHTENAW COUNTY EMPLOYEES'
                           RETIREMENT SYSTEM
6
7                          By: Mark Ouimet
8                          Its: Chair
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 2 -

CELERA

## CORRECTED SCHEDULE A

### SECURITIES TRANSACTIONS

#### Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 05/12/2008 - SD | 260 | $12.75 |
| 05/15/2008 - SD | 195 | $12.75 |
| 05/19/2008 - SD | 315 | $12.50 |
| 06/30/2008 - SD | 180 | $12.21 |
| 05/28/2009 - SD | 215 | $7.80 |
| 06/11/2009 - SD | 135 | $8.65 |

#### Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 10/02/2008 - SD | 24 | $15.53 |
| 10/03/2008 - SD | 76 | $15.49 |
| 07/14/2009 - SD | 96 | $6.90 |
| 07/15/2009 - SD | 147 | $6.96 |
| 07/15/2009 - SD | 217 | $7.00 |

*Opening position of 3,455 shares.

**Settlement dates are indicated with "SD" attached to the date.

# EXHIBIT A

# Personalizing Disease Management: Driving Growth

*Celera Analyst Day*
*New York, NY*
*September 9, 2008*



# Reimbursement
## *Payor Mix*



**BHL Payor Mix – 2008 Revenue**



**BHL Payor Mix – 2008 Sample Volume**

- Reimbursement varies significantly by payor, plan, and market
- Medicare reimburses based on a pre-established fee schedule and generally pays within 20 days
- Commercial reimbursement takes a significantly longer time than Medicare but generally reimburses at a higher rate
- United Healthcare and Aetna California are under contract, which speeds payment, but discounts revenue per test; other contracts expected over next several years



1

<u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on October 15, 2010, I authorized the electronic filing of the foregoing

3 with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4 the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5 caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6 CM/ECF participants indicated on the attached Manual Notice List.

7      I further certify that I caused this document to be forwarded to the following Designated

8 Internet Site at:  http://securities.stanford.edu.

9      I certify under penalty of perjury under the laws of the United States of America that the

10 foregoing is true and correct.  Executed on October 15, 2010.

11

12

/s/

WILLOW E. RADCLIFFE

13

ROBBINS GELLER RUDMAN
& DOWD LLP

14

Post Montgomery Center

15

One Montgomery Street, Suite 1800
San Francisco, CA  94104

16

Telephone:  415/288-4545

17

415/288-4534 (fax)
E-mail: willowr@rgrdlaw.com

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:10-cv-02604-JW

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **George Carlos Aguilar**
  GAguilar@robbinsumeda.com,Notice@robbinsumeda.com

- **Mark C. Gardy**
  mgardy@gardylaw.com

- **Catherine J. Kowalewski**
  katek@rgrdlaw.com

- **Judson Earle Lobdell**
  jlobdell@mofo.com,mblackmer@mofo.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,ryanl@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Jennifer Sarnelli**
  jsarnelli@gardylaw.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,jdecena@rgrdlaw.com,e_file_sf@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)